Portia MOTTER, Appellant,

and Lawrence Motter, h/w,

v.

EVEREST & JENNINGS,
INC., Appellee.

No. 89–1222.

United States Court of Appeals,
Third Circuit.

Argued July 25, 1989.

Decided Sept. 8, 1989.
Rehearing and Rehearing In Banc
Denied Oct. 5, 1989.

Robert B. White Jr. [argued], Rapp, White, Janssen & German, Ltd., Philadelphia, Pa., for appellant.

Christine Mooney Brenner [argued], John P. Penders, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, HUTCHINSON, Circuit Judge and WOLIN, District Judge *.

* Honorable Alfred M. Wolin, United States District Judge for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

WOLIN, District Judge:

Portia Motter appeals from an order of the United States District Court that entered a judgment notwithstanding the verdict (judgment n.o.v.) in favor of appellee, Everest & Jennings, Inc. following a $700,-000.00 jury verdict for Motter. The district court had jurisdiction pursuant to 28 U.S.C. § 1332 and we have jurisdiction in accord with 28 U.S.C. § 1291. Our review of the judgment n.o.v. grant is plenary. Because we are satisfied that there was sufficient evidence to support the jury's verdict, we will reverse the entry of judgment n.o.v. in favor of appellee and reinstate Motter's verdict.

## I.

Motter was employed as a nurse's aide at the Leader Nursing and Rehabilitation Center in Harrisburg, where she, among other duties, provided showers to residents who were unable to shower or bathe themselves. To do so, Motter and her co-employees used an economy model shower chair that was designed and manufactured by Everest & Jennings.

On October 13, 1986 a patient, immediately following a shower and while waiting to be dried, pushed her feet against the floor. This caused the front casters of the shower chair to lift off the floor, whereupon the front left caster fell out of the chair leg. As the chair and patient tilted to the left, Motter, in order to avert patient injury, quickly positioned her left arm under the left arm of the shower chair. Consequently, Motter's left arm bore the full weight of the patient and the shower chair. Motter experienced severe pain in her left arm that radiated down into her left hand. She also felt pain in her neck and shoulder and at the base of her skull. She received emergency medical treatment at Community General Osteopathic Hospital. Dr. Ger-

ald T. Turgeon, a neurologist, Dr. Robert R. Kaneda, a board-certified orthopedic surgeon, and Dr. Robert K. Jones, a neurosurgeon, provided follow-up care. The shower chair was removed from service and returned to the maintenance department for repair.

After an array of tests [1] and unabating pain in her left upper extremity, Motter returned to work at Leader on light duty status. She found that she was unable to perform even light duty work and is no longer working. Her doctors have concluded that Motter's use of her left upper extremity has been substantially impaired, that the pain in that extremity is permanent and that Motter is totally and permanently disabled from all nursing home work.[2]

On August 10, 1987 Motter and her husband Lawrence filed a product liability suit against Everest & Jennings for personal injury she sustained in the accident. The complaint asserted alternate theories of negligence, strict liability and breach of warranty. Specifically, Motter alleged that the Everest & Jennings shower chair was defectively designed. She also alleged that the company was negligent in its caster-affixing method. (The breach of warranty claim was withdrawn at trial.)

A jury trial commenced on May 23, 1988. The parties proffered expert testimony relevant to the released caster. The assembly design of the shower chair provides for the caster to be inserted into the tubular shower chair leg, where it is held in place by a steel split O-ring. This split O-ring, when manufactured, is slightly larger than the inside diameter of the tubular steel leg. When the caster stem is inserted into the leg, the split O-ring compresses and exerts force against the inside of the tubular steel leg, thereby engaging the caster in place.

---

1. The various testing included x-rays, EMGs, bone scans, nerve conduction studies, an enhanced CAT scan, a myelogram, MRI (magnetic residence imaging) and a neurological exam. The test results were primarily negative.

2. An EMG revealed an irritability at the last cervical nerve root C-8. The MRI revealed a slight herniation at the disc between the fifth and sixth cervical vertebrae and the sixth and seventh cervical vertebrae. Despite a determination of permanent injury no definite diagnosis emerged.

It was undisputed at the trial that the left front caster of the shower chair fell out of its tubular steel leg and was the cause of the accident. It was also undisputed that the caster should have remained in place. Everest further conceded that because of the shower chair's use in wet environments, the split O-rings were subject to corrosion and rust. Equally apparent at trial and uncontroverted was the fact that a user of the shower chair was unable to determine the condition of the caster stems and the split O-ring by visual examination because of their location in the tubular leg unit.

Motter's design defect theory centered on the method of affixing the caster to the chair. Through expert testimony she reasoned that water permeated the space between the inner diameter of the tubular leg and the caster stem, causing a phenomenon known as crevice corrosion, which over a period of time caused the split O-ring to deteriorate; at a certain point of deterioration the split O-ring ceased to function and the caster fell out of the chair leg. Motter maintains that a split O-ring made out of brass or some other material less corrosive than the steel used by Everest would be more appropriate for the wet environment in which the shower chair is used.

Everest & Jennings countered the allegations of design defect by urging that the shower chair had undergone post-delivery changes, had suffered improper maintenance and had been misused.

The district court denied Everest & Jennings's motion for a directed verdict, after which the jury returned a verdict in favor of Portia Motter.[3]

## II.

On review of the district court's grant of the judgment n.o.v. we must look to the record in order to determine whether sufficient evidence exists to sustain the jury verdict. *National Controls Corp. v. National Semiconductor Corp.*, 833 F.2d 491, 495 (3d Cir.1987). We must examine the record in the light most favorable to Motter and we may not sustain the entry of the order unless the record is devoid of the minimum quantum of evidence from which the jury might reasonably have afforded relief. *Link v. Mercedes–Benz of North America*, 788 F.2d 918, 921 (3d Cir.1986).

We begin our inquiry with the elements of a strict liability claim under Pennsylvania law. In *Hon v. Stroh Brewery Co.*, 835 F.2d 510 (3d Cir.1987), we noted that "[i]n Pennsylvania, a plaintiff asserting a strict liability claim against a manufacturer of a product must show that: (1) the product was in a defective condition when it left the hands of the manufacturer; and (2) the defect was a proximate cause of the plaintiff's injury." *Id.* at 512. We now examine the record to determine whether Motter proffered sufficient evidence to prove each of these elements.

## (A) *Defective Design*

■ As to the first requisite element, it was established that Everest & Jennings's caster-affixing method on its economy shower chair had not changed since 1965. App. at 313. The evidence further indicated that economy shower chairs were shipped to Motter's employer in January 1980. App. at 311. Although the precise chair that was involved in the accident remained undiscovered, a shower chair identical to it was admitted into evidence as Exhibit P–1. App. at 109. Thus, Motter initially demonstrated that the economy shower chair involved in the accident was constructed with steel split O-rings when it left Everest & Jennings's control. Motter next had to prove that the use of a steel split O-ring constituted a defective design.

To prove her theory, Motter relied on the expert opinions of Dr. Alan Lawley, a metallurgist, and Dr. Donald H. Thomas, a design engineer. Dr. Lawley testified that the economy shower chair was defectively designed in that the chosen geometry and materials would inevitably lead to crevice

---

**3.** The jury did not return a verdict for Lawrence Motter. He was thus not subject to the judgment n.o.v. and has not appealed.

corrosion. App. at 237–38. Dr. Lawley based his opinion on his examination of four casters that he removed from P–1, photographs and measurements of the casters, and a metal analysis of the caster stems and split O-rings. He performed similar analysis on a used caster system and studied Everest & Jennings drawings and specifications for the tubular steel leg and caster.

Dr. Thomas also concluded that the economy shower chair was defectively designed. He questioned the method by which the caster was attached to the leg of the chair, especially the use of steel parts in a wet environment. With the concurrence of steel and water, severe rust would occur and material would erode from the rusted part. The split O-ring would consequently reduce in size and lose its friction against the sides, causing the caster to eventually loosen and fall out. Both Lawley and Thomas testified that the split O-ring on the Everest & Jennings shower chair should have been made of brass, an uncorrodable material. App. at 238, 320.

Motter's evidence also included four shower chairs of comparable price manufactured by Everest & Jennings's competitors. None of these chairs used a split steel O-ring caster affixing method. In fact, two of them affixed the caster to the tubular leg by means of a bolt and nut. Two of the other sample chairs provided a noncorrosive cover for their caster stem to eliminate the phenomenon of crevice corrosion. App. at 240–41, 319–20.

Against the background of Motter's evidence, Everest & Jennings proffered the testimony of Peter W. Axelson, a rehabilitation engineer, and Curtis Wright, the Director of Product Safety at Everest. Although Axelson maintained that the split O-ring caster-affixing system was not a defective design, his conclusion was not supported by scientific analysis like that performed by Lawley: Axelson performed no measurements or tests on any of the casters, stems or split O-rings from Exhibit P–1. He also failed to review Everest & Jennings's specifications for these parts. His preparation consisted of reading Motter's deposition, Lawley's report, the complaint and answers to interrogatories; briefly inspecting competitors' shower chairs; and examining a "replica" of the shower chair involved in the accident. App. at 498–99.

Axelson could not deny that the caster stems and split O-rings were rusted. Nevertheless, he maintained that "rust is good" because it actually formed a tighter bond between the caster system and the tubular leg, thereby making Everest & Jennings's affixing method a good design. App. at 528. Axelson asserted that it would take 20 to 30 years before corrosion would prevent the split O-ring from holding the caster in the chair's leg. He had failed, however, to examine the casters removed from P–1 or to view the photographs. Upon viewing the exhibits, he admitted that the split O-rings that were removed from P–1 would not last for 20 to 30 years. App. at 527. Axelson was unable to name any other manufacturer that used the steel split O-ring caster-affixing method nor was he able to support his position with any promulgated standards regarding the design of the shower chair.

Wright testified that it was expected that a user would replace the chair after four or five years. App. at 189. The chair, however, was marketed as durable. App. at 175. Additionally, there is no record of Everest & Jennings ever having established a useful life for the chair. App. at 182. Furthermore, Wright testified that, except for the casters, the shower chair was capable of giving many years of additional service. This is borne out by the fact that Everest & Jennings sells replacement casters for the economy chair. App. at 189. Everest & Jennings's stance that the caster-affixing system was properly designed for the economy chair was undermined by Wright's testimony that a customer who wanted longer lasting casters should have purchased one of the more expensive models; this testimony is problematic because the other Everest models use the same caster-affixing method. App. at 203–04.

Everest & Jennings's final evidence that the caster-affixing method was not defectively designed was the fact that there had been no prior complaints about casters dislodging.[4] This argument was erroneously underscored by the district court. First, the only evidence as to the absence of prior complaints came from Wright, who based his testimony only on his personal knowledge and his review of Everest & Jennings's records for the past five years. Records are nonexistent beyond five years because Everest & Jennings destroys its older records. Second, the company lacked an established procedure or form to gather customers' complaints. Finally, Wright admitted that some of the other of Everest & Jennings's 699 employees may have received complaints about dislodging casters. Underscoring the lack of probative value of Wright's testimony regarding the absence of prior complaints was Motter's evidence that incidents had occurred at the nursing home in which the caster dislodged itself from the shower chair's leg. *See* App. at 299, 301, 330.

Under Pennsylvania law, a trial judge must evaluate the risks of a product versus its social utility in determining whether the issue of the defective product is to be submitted to the jury. *Childers v. Joseph*, 842 F.2d 689, 696–97 (3d Cir.1988); *Azzarello v. Black Bros.*, 480 Pa. 547, 558, 391 A.2d 1020, 1026 (1978). As the testimony illustrated, remedying the design of the caster-affixing system would not impair the utility of the chair and would have an inconsequential effect on the price of the shower chair. Thus, based on the risk/utility balancing test, the district court properly submitted the design defect issue to the jury. Since Motter had proffered expert opinions based on detailed scientific studies and other convincing evidence to support a finding that Everest & Jennings's caster-affixing system was defectively designed, it was for the jury to weigh the testimony and credibility of Motter's experts versus those of Everest & Jennings. The above-summarized evidence easily constitutes the minimum quantum of evidence from which a jury might reasonably afford relief. The district court erred in interfering with the jury's finding that Everest & Jennings's caster-affixing system was defectively designed.

**(B)** *Legal Cause*

■ The second requisite element of a plaintiff's strict liability case is proof that the defect was the proximate cause of the plaintiff's injury. Although it is undisputed that the caster fell out at the time of the accident, Everest & Jennings defends itself by asserting that the caster dislodged not because of defective design but rather because of negligent maintenance.

Motter established causation through the expert testimony of Lawley and Thomas. Their testimony, in turn, was based on the testimony of Motter, her co-worker, Packard, and the charge nurse, Susannah McCorts, all of whom testified that the stem of the caster that fell out was extremely rusty. Lawley and Thomas considered the possible causes for the dislodging caster and ruled all of them out except for the defective design theory. One proffered explanation was that the caster had previously fallen out and had been reinserted. Lawley and Thomas disregarded this as unlikely since under this explanation the caster would have inevitably dislodged each time the front legs of the shower chair were raised off the floor. Another idea advanced was that the caster had previously fallen out and that the maintenance department had done a makeshift repair instead of replacing the caster with a new caster system. The testimony of Motter, Packard and McCorts dispelled any evidence of makeshift repairs. The remaining explanation, and one the jury had a right to accept, was that the split O-ring had deteriorated to such an extent that it no longer retained the caster stem within the chair's tubular leg. The extent of the rust observed by Motter, Packard and McCorts was comparable to that of the stems of the casters removed from P–1, which had been in the chair since leaving the manufacturer.

---

**4.** While Everest & Jennings claims it did not receive complaints that the caster systems were dislodging, it did receive complaints that the systems were rusting. App. at 187.

Thomas provided additional insight into the falling out of the caster. After performing expansion studies for the caster stem and tubular leg from 65° F to 95° F, he concluded that the expansion and contraction of the metal broke the rust bonds that may have developed between the split O-ring and the tubular leg. This, in combination with the lubricating effect of the water, caused the caster stem to dislodge because the deteriorated split O-ring no longer exerted frictional force against the inside of the chair's leg.

Everest & Jennings advanced its negligent maintenance defense through the testimony of Axelson, who based his opinion on the testimony of Edward Baker, the maintenance supervisor at the nursing home. Motter accurately points out that Everest & Jennings's negligent maintenance causation theory required establishment of proof that the caster involved in the accident was a replacement rather than the original, that it was negligently installed and that enough of the inside of the tubular leg had been removed during the installation to cause the replacement caster to become loose and fall out.

It was Lawley's opinion that the caster involved in the accident was an original caster, not a replacement. Motter, Packard and McCorts each testified that all four casters had equal amounts of exterior rusting and that it did not appear to them that the caster had ever been removed. As noted earlier, the amount of rusting on the caster stem involved in the accident was similar to that on the caster stems removed from P–1, which were original casters. Lawley asserted that if the caster had been a replacement, it would have fallen out during the transfer of 19 patients showered immediately prior to the accident.

Axelson asserted that the caster involved in the accident was a replacement. He based this opinion on Baker's testimony that maintenance of the shower chair casters involved installation of replacement casters. Baker, however, was unable to testify that the caster involved in the accident was a replacement caster. In light of the inability to determine the identity of the particular shower chair involved in the accident, it would be reasonable for the jury to view Axelson's opinion with a healthy sense of skepticism.

Axelson theorized that the replacement caster was negligently installed. This was refuted by Baker's testimony that when he replaced casters, he did so properly. Furthermore, Wright's testimony corroborated the fact that it was virtually impossible to negligently install a replacement caster. App. at 192. The district court's conclusion that wire brushing of the interior of the tubular leg when removing a caster removed enough metal to cause the caster stem to loosen and fall out was unsubstantiated by the evidence.[5] Everest & Jennings provided no evidence to this effect. On the contrary, while Axelson testified that wire brushing enlarged the inside diameter of the tubular leg, he found it hard to "imagin[e] that you take out enough metal that a new caster assembly wouldn't stay in." App. at 484.

In granting Everest & Jennings's motion for judgment n.o.v., the district court failed to review the evidence in a light most favorable to Motter. The record amply provides the minimum quantum of evidence from which the jury might reasonably afford relief. *See Link,* 788 F.2d at 921. The district court failed to heed the limitations imposed on a trial court when considering a motion for judgment n.o.v. In *Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977), we offered the following guidance:

> The trial judge, in his review of the evidence, and this Court, in its own appellate review, must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference. At least two

5. The district court's conclusion that the alteration caused by the brushing of the tubular leg caused the caster assembly to fall out, App. at 628–29, was inconsistent with its statement that the caster "simply wore out." App. at 633.

factors are outside the perimeters of either court's review—the credibility of the evidence and the weight of it.

Moreover, conflicting evidence which could reasonably lead to inconsistent conclusions will not justify a judgment notwithstanding the verdict or a directed verdict. It is the function of the trier of fact alone, the jury in this instance, to evaluate contradictory evidence and to draw inferences therefrom.

. . . [A] trial judge, when deciding on a motion for a directed verdict or for judgment notwithstanding the verdict, should not determine whether the evidence 'preponderates' but must confine himself to ascertaining whether the party against whom the motion is made adduced sufficient evidence to create a jury issue.

*Id.* at 1178 (citations omitted). The district court erred in abjuring Motter's evidence and in substituting its interpretation of the facts for the jury's.[6]

### III.

■ Because of its entry of the judgment n.o.v., the district court never reached Everest & Jennings's alternative motion for a new trial. Rather, it indicated in its memorandum opinion that but for the judgment n.o.v. it would have granted Everest's motion for a new trial based upon the excessiveness of the jury's verdict. App. at 635. Neither the order of the district court nor the notice of appeal contains any reference to this conditional grant of a new trial. App. at 638–39.

In *Roebuck v. Drexel University*, 852 F.2d 715 (3d Cir.1988), the district court failed to mention in its opinion the alternative motion for a new trial although it did mention the alternative motion in its order. In *Roebuck* we read that order as a grant of both motions, with the grant of a new

trial plainly conditioned upon a reversal of the judgment n.o.v. *See id.* at 735. Although the district court's order does not refer to the alternative motion for a new trial, we believe that in the interest of judicial economy the grant of Everest & Jennings's motion for a judgment n.o.v. should likewise be construed as a conditional grant of its motion for a new trial. This comports with Fed.R.Civ.P. 50(c)(1), which provides that when a motion for judgment n.o.v. is granted "the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed." *Id.; see* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2539, at 609–10 (1971).

The rule anticipates precisely the circumstance that occurred here. "In case the motion for a new trial has been conditionally granted and the judgment [n.o.v.] is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered." Fed.R.Civ.P. 50(c)(1). Since we have determined to reverse the judgment n.o.v., we must next decide whether a new trial is warranted in this case. In harmony with past precedent we make this determination with due regard for our highly deferential scope of review. *Roebuck*, 852 F.2d at 735. We will therefore disturb the district court's conditional grant of a new trial only if we find that the court abused its discretion. *See id.* at 735, 736; *Salas v. Wang*, 846 F.2d 897, 907 (3d Cir.1988).

The district court was clear in setting forth its reasons why it would grant the motion for a new trial had it not entered the judgment n.o.v. It concluded that the verdict was excessive. A fair reading of the district court's memorandum opinion indicates that its focus was on the pain and suffering aspect of the verdict.[7] Such specification is an aid to appellate review.

---

6. In its memorandum opinion, the district court termed Axelson's theory as the only "tangible evidence" and characterized Lawley's testimony as a theoretical situation never realized. App. at 632. The district court further concluded that Motter failed to prove that Everest & Jennings's design of its economy model chair was defective as a matter of law.

7. After attribution for Motter's past as well as future medical claims and wage loss, the court determined that $429,000 of the $700,000 verdict was an award for pain and suffering. App. at 636.

*Roebuck,* 852 F.2d at 735 n. 34 (citing Wright & Miller, *supra,* § 2359, at 611 n. 78).

In reviewing the propriety of a jury verdict, our obligation is to uphold the jury's award if there exists a reasonable basis to do so. *Nairn v. National Railroad Passenger Corp.,* 837 F.2d 565, 570 (2d Cir. 1988). While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages. For the court to disturb a jury verdict, "the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court." *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979).

To assist our review, the parties have called our attention to several cases in which they contend the injuries equated with Motter's. Such an examination of awards in other cases involving similar in-juries serves as a helpful guide to whether a particular award is excessive. *Nairn,* 837 F.2d at 568. We are nonetheless mindful that each verdict revolves around a unique set of facts and circumstances. *Id.*

None of the cases cited to us is particularly apposite to Motter's circumstances.[8] Within our own jurisprudence only *Rivera v. Virgin Islands Housing Authority,* 854 F.2d 24 (3d Cir.1988), and *Gumbs v. Pueblo International, Inc.,* 823 F.2d 768 (3d Cir. 1987), are helpful. In *Rivera* this court upheld a verdict of $250,000 in favor of a plaintiff who after a slip and fall sustained a herniated disc with neurological involvement, suffered continuous pain and was unable to engage in practically any activity. *Id.* at 27–28. This case is most akin to Motter's.

Likewise in *Gumbs,* the plaintiff lost no time from work as a result of her accidental injuries, which included a sprained coccyx, a torn ligament, abdominal and vagi-

---

**8.** Everest & Jennings submitted to us *Nairn, supra, Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030 (3d Cir.1987) and *Harper v. Zapata Off-Shore Co.,* 741 F.2d 87 (5th Cir. 1984), as cases wherein courts determined that a verdict award for pain and suffering was excessive. In *Nairn* the award of $400,000 for pain and suffering caused by lumbosacral strain and disc degeneration was held to be excessive because the plaintiff was able to continue his employment and his pain specialist testified that over time his strained disc would "provide very little difficulty." 837 F.2d at 567–68. In *Williams* a recovery of $317,000 for pain and suffering due to a back injury was deemed excessive because the plaintiff showed no objective signs of neurological deficiencies or active radiculopathy. One of his treating physicians determined that Williams had totally recovered, without any neurological or muscular residual. 817 F.2d at 1038–40. In *Harper* a seaman's recovery of $485,000 for pain and suffering was found to be excessive despite two surgical episodes to repair ruptured discs. Harper did not claim total and permanent disability. Furthermore, the surgeries were successful and left him with residual pain that was comparable to a toothache. 741 F.2d at 92–93. For additional cases illustrating that courts of appeals are willing to reduce excessive jury awards, see, for example, *Laaperi v. Sears, Roebuck & Co.,* 787 F.2d 726, 735–36 (1st Cir.1986) (where a $750,-000 award to a 12–year–old who suffered first- and second-degree burns over 12 percent of her body was excessive since the court found no continuing disability); *Kazan v. Wolinski,* 721 F.2d 911, 913–15 (3d Cir.1983) (in which this court approved the district court's remittitur of $90,000 from a jury verdict of $150,000 when expert testimony indicated that the accident had not caused certain of plaintiff's injuries); *Perricone v. Kansas City Southern Railway Co.,* 630 F.2d 317, 319 (5th Cir. Unit A 1980) ($170,000 deemed an excessive award to plaintiff who lost earnings of $4,000, lost 30 percent of the motion in his neck, sustained substantial damage to his teeth and suffered occasional periods of discomfort from whiplash); *O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1089–90 (2d Cir.1978) ($170,000 award deemed excessive for an airline flight attendant who suffered back injury, underwent a laminectomy, lost $10,000 in wages but returned to her duties, albeit on smaller planes, and later won commendations for reliability and perfect records). The factors dictating remittiturs in the above-cited cases are absent in Motter's case.

*Motter's* reference to *Murray, supra,* in support of the verdict is inapposite. The $1,700,000 verdict in *Murray* for pain and suffering pertained to injuries unquestionably more serious than those of Motter. Murray suffered spinal injuries that required two surgeries to remove a herniated disc. Murray's most serious injury was to a group of nerves called the cauda equina, which control urinary, fecal and sexual functions. The injury resulted in incontinence and sexual dysfunction and forced Murray to wear a genital clamp to control his bladder. Murray's condition was not expected to improve and would probably shorten his life span. 610 F.2d at 153–54.

nal pain, and back spasms. This court, based on the record, stated that "the maximum recovery without shocking the judicial conscience that a jury reasonably could have awarded the plaintiff for pain and suffering, mental anguish, and loss of enjoyment of life would have been $235,000." 823 F.2d at 775. Motter contends that *Gumbs* implicitly supports the conclusion that the jury verdict in this case was not excessive.

■ Given what this court expressed as a reasonable verdict for the *Gumbs* plaintiff, we now examine whether the record supports an award to Motter of $429,000 for pain and suffering.[9] The district court's memorandum opinion narrowly confined the noneconomic portion of the verdict to pain and suffering. This constraint is belied by the evidence. Motter sought recovery not only for pain and suffering but for embarrassment and for loss of life's pleasures. *See* App. at 6.

Dr. Jones found that Motter was totally and permanently disabled from performing nursing home work. This was not refuted by Everest & Jennings. Motter complains of constant pain, which has not been alleviated with treatment. Both Drs. Jones and Kaneda have concluded that this pain is permanent[10] and that the pain is real, not imaginary. App. at 268, 412–13. Motter's pain precludes her from reading for more than ten minutes at a sitting. App. at 136. The pain impedes her ability to do her housework.[11] Her left hand is weakened so she intermittently drops things. App. at 135–36. Motter's pain renders her irritable with her husband and daughter, App. at 78, 136, disrupts her sleep, App. at 138, affects

her sexual relations with her husband, App. at 139, interferes with family vacations, App. at 140–41, and causes her to suffer from depression, App. at 132.

While Motter's injuries defy a definitive diagnosis, this uncertainty does not in any way minimize the extent of her injuries or the accompanying disabling pain. Drs. Jones and Kaneda have both, with the requisite degree of medical certainty, determined that Motter's condition is a combination of injuries including chronic cervical strain, cervical disc herniation, reflex sympathetic dystrophy and brachial plexus injury. Additionally, Dr. Jones testified that there are injuries to the tendons and ligaments along the spine. Dr. Kaneda explained that "all [of Motter's] diagnoses, have some verifying facts that substantiate that diagnosis, but there is not one diagnosis in the lot of them that encompasses all of her symptoms, that is able to describe or to adequately contain those symptoms with one diagnosis." App. at 402–03.

In its memorandum opinion, the district court emphasized the lack of a definitive diagnosis and in effect discounted Motter's pain and suffering. Given the fact that all of her treating doctors found Motter's pain to be real, the district court erred. By way of analogy, we have consistently held in social security cases that a claimant's subjective complaints of pain and other symptoms may not be ignored or disregarded, particularly where the claimant has made such complaints during physicians' examinations. *See Dorf v. Bowen,* 794 F.2d 896, 902 (3d Cir.1986).

We are satisfied from the evidence in the record that Motter's protestations of con-

---

9. We need not consider the remaining $271,000 of the verdict since it is undisputed and finds abundant support in the record.

10. As to the permanency of Motter's pain, Dr. Jones testified:

I feel that the patient's having had this degree of pain for this length of time and her unresponsiveness to very many different kinds of treatment with no effect, I feel that her—the pain that she has at the present time is going to be with her the rest of her life.

App. at 264. Dr. Kaneda testified:

It has been my experience that if you have symptoms of this type and this intensity for this period of time, that they will be permanent. They may wax and wane but they will be persistent.

App. 404.

11. Motter has difficulty cleaning and cooking and can no longer garden, shovel snow or bowl. *See* App. at 74–75.

stant pain are real, that she is permanently disabled from future nursing home employment, that she is unable to participate in and perform the various home and recreational activities she engaged in prior to the injury, and that there exist objective medical indicia of her injuries. Accordingly, there is a reasonable basis to uphold the jury's award. Although the jury award of $429,000 is higher than the amount the district court would have awarded, it is not so excessive or irrational as to shock the conscience of the court. Under this particular set of circumstances the grant of a new trial as to damages would constitute an abuse of discretion. Therefore, we will reinstate the verdict.[12]

### IV.

In its motion for a new trial Everest & Jennings asserts grounds for a new trial beyond the issue of excessiveness of verdict. The district court did not address these issues in its memorandum opinion. We find these other assignments of error to be without merit and dispose of them without comment.

### V.

For the foregoing reasons we will reverse the judgment n.o.v. and reinstate the jury verdict of $700,000.

---

**12.** Although we acknowledge that the issue of new trials should ordinarily be left to the sound discretion of the trial judge, we express concern about a procedural aspect of the district court's conditional grant of a new trial. Since it was based on the excessiveness of the verdict, even in the absence of a motion for remittitur, the order for a new trial should have been limited solely to the issue of damages. The issue of excessiveness would not implicate the jury's finding as to liability. *See Walters v. Mintec/International,* 758 F.2d 73, 82 (3d Cir.1985).