Captain Tammy S. BLAKEY, Plaintiff,

v.

CONTINENTAL AIRLINES, INC., a foreign corporation, Defendant.

Civ. No. 93–2194 (WGB).

United States District Court,
D. New Jersey.

Jan. 30, 1998.

Short Chessman & Burgess, P.L.L.C., Seattle, WA, by David E. Breskin, Law Offices of Linda B. Kenney, Red Bank, NJ by Linda B. Kenney, Gregory S. Schaer, for Plaintiff.

Epstein Becker & Green, P.C., Newark, NJ by Robert H. Bernstein, Margaret M. Madden, Mark D. Lurie, Michael D. Markey, for Defendant.

## OPINION

BASSLER, District Judge.

After a five-week trial, the jury found Defendant Continental Airlines, Inc. liable for sexual harassment and awarded Plaintiff Tammy S. Blakey a total of $875,000. Defendant now moves for a new trial on damages, or alternatively, a remittitur of the jury award in favor of Plaintiff.

## I. BACKGROUND

Plaintiff Tammy S. Blakey ("Blakey") has been employed as a pilot with Defendant Continental Airlines, Inc. ("Continental") since 1984.[1] She was Continental's first female captain on the A300 Airbus aircraft. In 1993, Blakey filed suit alleging 1) hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1 et seq.; 2) disparate treatment sex discrimination in violation of Title VII and LAD; 3) retaliation in violation of Title VII, LAD, and the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19–1 et seq. ("CEPA"); and 4) defamation. She testified that pornographic pictures were placed in the cockpits of aircraft and that obscene and harassing comments were directed toward her. Evidence at trial

---

1. Blakey has been on voluntary unpaid leave of absence since August 1993.

supported her claim that she informed Continental managers of these problems, but that no effective action was taken to eliminate the pornography or the comments.

Blakey also alleged that she was punished for leaving early when on "reserve position" at Newark, while male pilots on reserve were allowed to leave early with no adverse consequences. Blakey also alleged that after she complained about the unfair treatment and the sexual harassment, Continental retaliated against her by, among other things, denying her a leave of absence and requiring her to undergo a psychiatric examination and a flight simulation test before allowing her to fly. Blakey's defamation claims were based on allegedly offensive statements made about her by other pilots on a Continental pilots' computer forum.

The Court granted summary judgment for Continental on Blakey's defamation claim on March 9, 1997. The remaining claims were tried for five weeks in September and October 1997. At the close of her case, Blakey voluntarily dismissed her CEPA claim. On October 16, 1997, the jury returned a verdict in favor of Blakey on her sexual harassment claim, but rejected her claims of disparate treatment sex discrimination and retaliation. The jury awarded Blakey $480,000 in back pay, $15,000 in front pay, and $500,000 for emotional distress, pain and suffering, but did not award any punitive damages. The jury also found that Blakey had failed to mitigate damages, and subtracted $120,000 from her back pay award of $480,000. The Court entered judgment on the jury's verdict on November 5, 1997.

Pursuant to Fed.R.Civ.P. 59, Continental now moves for a new trial on the damages award only, or in the alternative for remittitur.

## II. *DISCUSSION*

### A. *Standard for New Trial or Remittitur*

■ The standards governing a motion for a new trial or remittitur are easy enough to articulate but not always so easy to apply—particularly after a long trial such as this one. There are for the trial judge, as often is the case, competing considerations:

one is respect for the fact finding function of the jury; the other is the trial judge's responsibility to make sure the evidence supports the award of damages. The criteria governing the trial court's evaluation are articulated in a number of ways. A new trial is warranted only where the verdict is grossly excessive and bears no rational connection to the evidence. *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir.1987). The court should order a new trial or remittitur if "a miscarriage of justice would result if the verdict were to stand." *Delli Santi v. CNA Insurance Companies*, 88 F.3d 192, 201 (3d Cir.1996) (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992)). Some courts hold that the verdict stands unless it "cries out to be overturned or shocks the conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3rd Cir.1991).

■ In reviewing a jury verdict, the court's "obligation is to uphold the jury's award, if there exists a reasonable basis to do so.... [A] court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989) (emphasis in original). On a motion for a new trial, the court is permitted to consider the credibility of witnesses and to weigh the evidence, however the court must "exercise restraint to avoid usurping the jury's primary function." *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 403 (D.N.J.1996). Therefore, a judge's mere belief that the jury was unduly generous is not sufficient to warrant a new trial. *Dunn v. HOVIC*, 1 F.3d 1362, 1367 (3d Cir. 1993).

■ On the other hand, on the issue of whether a damages award is excessive, this Circuit has on more than one occasion instructed that the trial court "should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds." *Walters v. Mintec/International*, 758 F.2d 73, 82 (3d Cir.1985); *Gumbs*, 823 F.2d at 773. The increased willingness of appellate courts to review damage awards "is a response to the increasingly outrageous amounts demanded by plaintiffs and awarded by juries."

*Gumbs,* 823 F.2d at 773. If the verdict is a result of passion or prejudice by the jury, a new trial, rather than remittitur, is the appropriate remedy. *Dunn,* 1 F.3d at 1383. Damage awards that are merely excessive or so large as to appear contrary to reason, however, are subject to remittitur rather than a new trial. *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 178 (5th Cir.1992). Keeping in mind the criteria and concerns of Third Circuit law, the court turns to an evaluation of the defendant's argument that an award of $500,000 for pain and suffering on this record is so excessive that a new trial or remittitur is warranted.[2]

### B. *Emotional Distress Award*

■ Continental argues that the jury's $500,000 award for emotional distress and pain and suffering "bears no relationship whatsoever to the 'evidence' regarding the plaintiff's alleged injuries." Defendant's Brief at 13. The argument is overstated. There is a relationship, but the evidence of injury cannot support an award of $500,000.

The only testimony on emotional distress came from Blakey herself and from her expert witness, Dr. Robert Sadoff, a forensic psychiatrist who met with Blakey once for two hours and reviewed her medical records for 90 minutes. Dr. Sadoff testified that Blakey suffered some emotional distress from her work environment but that other events in her life unrelated to work—particularly the volatile relationship with her boyfriend's ex-wife—contributed to this mild emotional distress.

Plainly Blakey was subjected to stress from factors other than sexual harassment. She testified that

> being a pilot in and of itself is stressful....I mean it's a technical job. I have at times, you know, 200 to 272 passengers, you know, lives in my hands. It's like operating a mini-corporation right there. You're dealing with mechanics, you're dealing with fuelers, caterers, the flight attendants, weather people. It's—sometimes you're dealing with emergency situations, the weather. It's a stressful job.

Tr. 9/12/97, 86:23–87:4; Bernstein Cert., Exh. C.

Blakey also conceded that her personal life was stressful, particularly the events arising out of her romantic relationship with Andy Floe. Andy Floe's estranged wife, Kelly Floe, obtained a restraining order against Blakey and physically threatened Blakey with a shovel. Tr. 9/19/97, 23:17–21; 24:10–13; 26:1–2; Bernstein Cert., Exh. F. Kelly Floe also harassed Blakey by parking in her driveway and repeatedly honking her horn. *Id.* at 26:12–23. Blakey was even arrested in July 1992 in connection with the dispute with Kelly Floe. *Id.* at 25:4–10. Finally, as part of the bitter divorce proceedings between the Floes, a guardian *ad litem* for the Floe children issued a report criticizing Blakey and recommending that she have no contact with the children. Blakey testified that she was upset because she felt the report's findings were untrue. *Id.* at 37:15–18. These incidents occurred in 1992 and early 1993, at the same time that Blakey was flying and experiencing emotional distress from work-related sexual harassment.

Blakey, argues, correctly, that she is not required to introduce expert testimony to recover for emotional distress. But Blakey is looking for the kind of damages that are rarely awarded without expert testimony. Significantly, she did not seek psychological counseling (and later, medical treatment) until February 1993, nearly three years after the harassing incidents began. The evidence also indicated that her psychological counseling alleviated the symptoms of anxiety and depression that she had attributed to her stressful work environment. Although she testified that she suffered from severe headaches in mid–1993, the headaches went away after she was put on medication in July 1993.

Even her expert, Dr. Sadoff, testified that Blakey "seemed fine" and "did not have any serious mental problems" when he spoke with her in June 1994, approximately 16 months after she began receiving psychologi-

**2.** Federal law governs whether a remittitur should be granted in diversity actions. *Kazan v. Wolinski,* 721 F.2d 911, 913 (3d Cir.1983).

Therefore, the issue of remitting Blakey's damages award is subject to the same standard whether the award is under Title VII or LAD.

cal counseling. Tr. 9/16/97, 23:23–24; Bernstein Cert., Exh. D. Blakey presented no evidence regarding her emotional state from mid–1994 through 1997, other than her own vague statement that her emotional distress continued "to some extent." Although her treating psychologist, Dr. Deborah DeWolfe, was present in the courtroom during the trial, she did not testify. Dr. Sadoff could render an opinion based on Dr. DeWolfe's records as to Blakey's psychological injury up to June 1994. But he rendered no opinion as to her condition subsequent to June 1994. Tr. 9/16/97, 32:13–17; Bernstein Supp. Cert., Exh. A. Dr. DeWolfe, although available to corroborate Blakey's testimony as to her emotional condition after June 1994, did not. This is not the kind of evidence that $500,000 awards are made of.

■ Finally, Blakey was never actually fired by Continental. Rather, she went on a medical (and later administrative) leave with the permission and acquiescence of Continental. After she went on leave in 1993, her harassment-related stress could not have continued at the same level as prior to her leave, for the simple reason that she was no longer in the cockpit on a regular basis and was no longer directly exposed to pornography. It is clear from Blakey's own evidence that the emotional distress she suffered was not so serious as to prevent her from flying; her treating psychologist and one of Continental's doctors found that she was emotionally fit to captain an aircraft in April 1993. She was certainly not disabled by emotional distress after 1993; in fact, she was able to manage her ranch in Washington State while she was on leave.[3]

■ Additionally, Continental was found liable *only* on the sexual harassment claim. Contrary to Blakey's belief, this is not without legal significance on the issue of damages. Blakey cannot recover for emotional distress that was caused by what she alleged to be disparate treatment or retaliation. Blakey's brief improperly cites incidents such as being locked out of the computer system, being accused of violations of sick leave policies, and being required to pass a flight simulation before returning from leave as examples of "harassment" contributing to the "hostile work environment." See Plaintiff's Brief, App. A. These allegations were actually raised as part of Blakey's sex discrimination and retaliation claims, which the jury rejected. They are therefore not proper bases for recovery of emotional distress damages in this case. Blakey is not entitled to recover for every incident that "upset" her during the relevant time period.

The court may consider awards in other cases involving similar injuries as a "helpful guide" to whether a particular damage award is excessive. *Motter v. Everest & Jennings,* 883 F.2d 1223, 1230 (3d Cir.1989). *See also Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir.1987); *Hurley,* 933 F.Supp. at 403. This review may include cases from other circuits. *See Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1040 (3d Cir.1987). Both Continental and Blakey cite to cases supporting their respective views that the award in this case either shocks the conscience or is within the range of reason.

There is no question that the $500,000 award for emotional distress and pain and suffering in this case is far greater than the vast majority of awards in similar Title VII cases. Blakey conceded at oral argument that the award in this case is at the high end even among the cases she cites. In fact, in two of Blakey's "Top 3" cases, *Von Stein v. Brescher,* 696 F.Supp. 606 (S.D.Fla.1988), *rev'd on other grounds,* 904 F.2d 572 (11th Cir.1990) and *Brocklehurst v. PPG Industries,* 865 F.Supp. 1253 (E.D.Mich.1994), *rev'd on other grounds,* 123 F.3d 890 (6th Cir.1997), the district courts also pointed out that the $500,000–plus awards were in the high end of the usual range of awards.[4] Fur-

---

**3.** Additionally, some of Blakey's stress after 1993 may be due to the contentiousness of this litigation. She cannot recover for emotional distress caused by litigation. *Picogna v. Board of Educ. of Tp. of Cherry Hill,* 143 N.J. 391, 397–98, 671 A.2d 1035 (1996).

**4.** Incidentally, both *Von Stein* and *Brocklehurst* were reversed on appeal and judgment as a matter of law was granted for the defendants. In the other "Top 3" cited by Blakey, *Lipsett v. University of Puerto Rico,* 759 F.Supp. 40 (D.P.R.1991), the $525,000 award was a *combined* back pay and mental distress award and therefore does

thermore, plaintiffs in New Jersey LAD cases have recovered even less. Blakey has not cited, and the Court cannot locate, any reported LAD cases in which a plaintiff has recovered even close to $500,000 for emotional distress.

Many cases illustrating damage awards far lower than the award in this case were cited by the court in *Hurley, supra,* where the court remitted the plaintiff's emotional distress damages from $575,000 to $175,000. In *Hurley,* the court observed that "[a]wards for emotional distress in discrimination cases under § 1983, § 1981 and Title VII rarely come close to $575,000 and typically are for less than $50,000." *Id.* at 423. Contrary to Continental's assertions, however, there are cases under both Title VII and LAD in which substantial emotional distress damages have been awarded. *See, e.g., Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 480 (3d Cir.1997) (remitting jury award, but still awarding plaintiff $100,000 in emotional distress); *Rendine v. Pantzer,* 141 N.J. 292, 311, 661 A.2d 1202 (1995) (upholding emotional distress awards of approximately $105,000 and $125,000). The issue is not the amount of the award, but the evidence supporting the amount.

When comparing other cases, the court must be "mindful that each verdict revolves around a unique set of facts and circumstances." *Motter,* 883 F.2d at 1230. Therefore, although the Court looks to other cases for guidance, the primary consideration must be the particular facts and circumstances presented in this case. The focus of attention is not the size of the award alone, but the evidence supporting the award.

After reviewing jury verdicts in analogous cases, and more importantly, analyzing the trial evidence in support of pain and suffering, the Court concludes that the award of $500,000 is grossly excessive in relation to Blakey's injury and extends beyond reasonable grounds. The Court's conclusion is based on the weight of the evidence at trial indicating that although Blakey suffered serious emotional distress, it was less severe at

times and it was not entirely due to sexual harassment by Continental. Although Blakey testified that, in 1991, she was touched by a pilot who threatened to "kill her" if she reported him, this was an isolated incident, and Blakey did not allege that she was regularly subjected to physical touching or assaults. Throughout 1992 and 1993, her work-related stress overlapped with serious personal problems. The regular exposure to pornography ceased by mid–1993. Furthermore, she received psychological counseling starting in early 1993 that diminished her symptoms of stress, to the point where she seemed "fine" to her expert in June 1994. She presented no evidence of continuing compensable emotional distress after 1994. These factors all militate against an extremely high award.

The Court does not denigrate Blakey's psychic dissonance caused by the pornography, especially when some of it was directed at her, and the frustration she experienced with Continental's initially ineffective sexual harassment policy relating to pornography. But what Blakey experienced cannot justify an award of $500,000. Blakey's own testimony and that of her expert concerning the extent of her injury is significant.

Blakey was never hospitalized. She is not disabled from future employment. She admitted that in April 1993 she was perfectly fit to fly. Dr. O'Connor examined Blakey on April 30, 1993 and found her fit not just to go back to work but to captain a commercial aircraft, which she in fact did. There was no evidence of any permanent psychological disability.

Although she did not return to work because of her perception that the workplace was still contaminated with hostility emanating from her strong stand against pornography, there is no evidence that anxiety and depression prevented her from working. Nor is there any evidence that her emotional distress incapacitated her from engaging in activities she engaged in prior to the injury.

not support Blakey's argument that a $500,000 emotional distress award is "within the range" of other awards.

She did not testify that she needed or today needs continued counseling.

■ "A jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs*, 823 F.2d at 773. The award of $500,000 for pain and suffering cannot be supported by this record. The amount is so disproportionate to the injury as to shock the judicial conscience and constitute a manifest injustice.

■ Continental argues that the jury's verdict must have resulted from passion and prejudice, but does not provide evidence of this other than citing the large amount of the award. The Court sees no indication that the jury acted irrationally in favor of Blakey or against Continental. This was not a "runaway jury." The jury considered the evidence and rejected Blakey's sex discrimination and retaliation claims. Furthermore (and despite Continental's paucity of evidence on the issue), the jury analyzed the evidence and determined that Blakey had failed to mitigate damages in the amount of $120,000. Finally, the jury denied Blakey punitive damages after being importuned unrelentingly in a protracted and emotionally charged closing argument on the subject.

The jury heard Blakey and her expert testify that she suffered emotional distress caused by the obscene pictures and comments that continued to appear in the cockpit despite her complaints to Continental management. She repeatedly testified that she was "upset," "embarrassed," and "humiliated" by the harassment. Although the jury overestimated Blakey's damages, given the concrete evidence of emotional distress, the Court cannot conclude that the jury's damages award was the result of passion or prejudice. A jury influenced by the spirit of generosity is not the same as one inflamed by the demon of passion. Because the Court

finds that the verdict was excessive, but not a result of passion or prejudice, remittitur, rather than a new trial, is the appropriate remedy. *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir.1993).

■ Remittitur of the verdict is warranted where the jury verdict is clearly unsupported by the evidence and exceeds the amount needed to make the plaintiff whole or to remedy the effect of the employer's discrimination. *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 423 (D.N.J.1996). Courts have reduced jury awards when the damage award is so large as to seem improbable, even though it may still be possible. *Spence v. Board of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986). It is the court's responsibility to "review a damage award to determine if it is rationally based" and to order remittitur where it is not. *Martin Marietta*, 817 F.2d at 1038. The New Jersey Supreme Court has also acknowledged the utility of the procedure and has instructed its appellate and trial courts to use remittitur when faced with excessive verdicts because "it avoids the unnecessary expense and delay of a new trial." *Fritsche v. Westinghouse Elec. Corp.*, 55 N.J. 322, 331, 261 A.2d 657 (1970). In the Third Circuit, a remittitur should be granted to the maximum amount that a jury could have reasonably found. *Gumbs*, 823 F.2d at 772 (*citing Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir.1970)).

■ Blakey testified that the primary source of her emotional distress was the sexual harassment she experienced at her job. She testified that the problems in her personal life caused her some distress, but not continuing distress. For example, she testified that although her arrest (arising out of her dispute with Kelly Floe) initially upset her, she later felt "vindicated" because all charges against her were dismissed. *Id.* at 25:5–8.[5] Furthermore, she testified that although the guardian *ad litem's* report upset her, she "remedied that upsetness" by submitting a formal sworn statement disputing the report's findings. *Id.* at 48:3–11.

---

**5.** Blakey testified that she was not actually jailed in connection with the arrest, but merely held at

the police station. *Id.* at 25:12–16.

Blakey also testified that despite these incidents in her personal life, she was far more distressed by the sexual harassment and Continental's failure to remedy this harassment by promptly removing pornography from the aircraft. Tr. 9/16/97, 90:9–15; Bernstein Cert., Exh. D. The sexual harassment began in December 1989, while she was at ground school for Airbus A300 pilots. Blakey testified that during slide presentations, the projectionist would intermittently show a slide of a female cartoon character, "Fifi," and that each time the slide was shown, the male pilots would say, "There's Tammy." Shortly thereafter, in January 1990, Blakey boarded an aircraft for her first flight as an A300 captain and found a blond-haired doll placed in her captain's seat.

Blakey testified that pornography was "everywhere" and that it consistently appeared in A300 aircraft until she stopped flying and went on leave in 1993. For example, Blakey testified that on one flight in 1991, a pornographic picture fell out of a flight manual while an FAA inspector was looking through it. She testified that pornographic pictures were placed behind panels in the cockpit marked with an "X" so pilots would know to remove the panels to view the pictures. Pornographic pictures were also glued to the bottom of drawers in the cockpit and could not be removed. Additionally, in the spring of 1992, Blakey began seeing pornography specifically directed at her. This continued until at least January 18, 1993, when Blakey saw a pornographic picture in a flight manual with "Tammy Blakey" written on it.

Blakey testified that the anxiety and depression caused by these and other incidents of sexual harassment prompted her to begin psychological treatment starting in February 1993. She met with her psychologist approximately 25 times. Blakey had never had a psychological condition requiring treatment, and had not taken a medical leave prior to this point in her career. Blakey stated she developed severe headaches, presumably from stress, which required medication and consequently a medical leave from flying in mid–1993. Tr. 9/12/97, 145:17–147:14; Bernstein Cert., Exh. C. She testified that she suffered from stomach pains and sleeplessness as well for a period of time in 1993. Tr. 9/16/97, 86:7–87:17; Bernstein Cert., Exh. D.

Blakey's expert, Dr. Robert Sadoff, also testified that she suffered from anxiety and depression at the time of these incidents and that in his opinion, the work environment at Continental "was the major source of her anxiety and her depression." Id. at 24:14–25. He conceded that Blakey's difficult pregnancy and her problems with Kelly Floe in 1992 and 1993 "must have contributed to her stress" and that they "could not be ignored, they must be considered" in evaluating the cause of her anxiety and depression. Id. at 40:3–9; 41:16–18. Still, he concluded that the problems at Continental were the primary source of Blakey's emotional distress. Id.

The Court concludes that the maximum reasonable emotional distress award warranted by the facts and evidence in the case is $250,000. This undoubtedly is a high figure in light of the record previously discussed and in light of the reported cases in the Third Circuit and in New Jersey. But it reflects this Circuit's jurisprudence that a "court may not require a reduction in the amount of the verdict to less than the 'maximum recovery' that does not shock the judicial conscience." Gumbs, 823 F.2d at 774. It also recognizes the function of the jury as the finder of the facts. Any lower amount would intrude on the province of the jury.

 Despite factors outside Continental's control that contributed to her stress, Blakey's emotional trauma cannot, as Continental would have it, be cavalierly dismissed. She had to put up with pornography in her workplace for at least three years. She was subjected to vile and disgusting pornography directed at her. She was treated by a psychologist for several years for the stress-related problems caused by the sexual harassment. Unlike the plaintiff in Hurley, Blakey did not have any indications of psychological problems prior to these incidents. Unlike cases where plaintiffs had no physical symptoms, hers became so severe that she was placed on psychotropic medication for a period of time. Unlike many of the analogous cases, Blakey's symptoms were identifiable, treated by a professional, and resulted

in medication and medical leave. Moreover, they were uncontradicted. Finally, due deference should be given "to the jury's obvious belief that a large award is called for." *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 425 (D.N.J.1996). The remitted award of $250,000 is therefore appropriate.

Any remittitur can be subject to a legal realist's observation that what is really happening is the substitution of the judge's decision for that of the jury. But as long as remittitur is available as a useful tool to avoid a new trial, it should be utilized. The Court has endeavored to follow the Circuit's instructions, consider similar cases, evaluate the evidence and determine a damages figure that is rationally related to the evidence, mindful that "[t]he determination of that amount may not be precisely calculated." *Gumbs*, 823 F.2d at 774. On this record, to put it bluntly, an award of $500,000 is off the wall. The remitted award of $250,000 is high, but within the realm of reason.

At the parties' request, because of issues relating to Continental's bankruptcy, the jury segregated from the total amount of damages awarded to Blakey those damages that were caused by Continental's conduct before April 16, 1993. The jury apportioned $150,000 (30%) of its $500,000 pain and suffering award to Continental's conduct after April 16, 1993. There is no evidence in the record to support the allocation of such a large percentage of damages to conduct occurring after April 16, 1993. It is not a case where the evidence is thin; it is virtually nonexistent.

It is undisputed that Blakey did not fly for much of 1993. Blakey could not have suffered emotional distress of the severity and frequency that she had experienced prior to 1993. She did not fly at all after mid–1993; therefore she was not directly confronted with the offensive pornography on a regular basis, as she had been during the previous three years. She also began receiving psychological and medical treatment in early 1993 for her symptoms of stress and anxiety. Although Blakey claimed on the stand that her anxiety and depression continued "to some degree" through February 1997, her emotional distress had clearly receded to the point that in June 1994, Dr. Sadoff described her as "fine" and not suffering any serious continuing distress.

Blakey attempts to defend the jury's determination by arguing that although the jury specified that $350,000 in damages were attributable solely to Continental's conduct *before* April 16, 1993, the jury was not asked to specify the amount of damages caused solely by Continental's conduct *after* this date. Blakey's argument resembles a Möbius strip, which twists around yet ends in the same place. Blakey's argument accepts that the jury allocated 70% of damages as traceable to Continental's conduct pre-April 1993, but refuses to accept the natural and logical conclusion that the jury therefore considered 30% of the damages to be attributable to post-April 1993 conduct. This inherently logical result is not precluded simply because the jury was not explicitly asked to note this result on the verdict sheet.

Regardless of Blakey's hypertechnical argument, she presented no evidence that she suffered substantial emotional distress after April 16, 1993. She was no longer directly exposed to the conduct that had caused her distress. Blakey states that her "work environment" became "intimidating and hostile by being denied the right to return to active flying, being forced to submit to a psychiatric examination and being forced to take an unnecessary flight simulator test ... and an unwarranted air check test." Plaintiff's Brief at 18. The Court fails to see how Blakey could have been seriously distressed by the intimidating "work environment" when she was voluntarily absent from that "work environment" for most of the period after April 16, 1993. Furthermore, the charge that she was forced to submit to an examination and flight testing was part of Blakey's retaliation claim, not her sexual harassment claim. Finally, to the extent that Blakey learned of the behavior of management or other pilots after April 16, 1993, most information was learned either through litigation or the computer threads, for which Blakey cannot recover.

There is evidence that Blakey saw two pornographic pictures during her flights and suffered headaches for a short time (until she

was placed on medication) after April 16, 1993. Therefore, the jury could have reasonably apportioned a small amount of emotional distress damages, traceable to her viewing these two pictures and a suffering some residual stress, after that date. The evidence demonstrates, however, that the vast majority of Blakey's emotional distress occurred prior to April 16, 1993. Therefore, the Court apportions $5,000 (2%) of the remitted emotional distress award of $250,000 to Continental's conduct after April 16, 1993, and $245,000 (98%) of the award prior to April 16, 1993.

■ The Third Circuit has held that where the facts as to compensatory damages are in dispute, a court may not remit a plaintiff's damages without her consent, but must offer the plaintiff an option between accepting the remittitur or submitting to a new trial. *Scott v. Plante,* 641 F.2d 117, 136–37 (3d Cir.1981), *vacated on other grounds,* 458 U.S. 1101, 102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982). A district court has the power to grant a new trial conditioned on the plaintiff's refusal to agree to a remittitur. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 431, 116 S.Ct. 2211, 2222, 135 L.Ed.2d 659 (1996). Therefore, the Court conditionally grants Continental's motion for a new trial on emotional distress and pain and suffering damages only if Blakey refuses to agree to a remittitur of the emotional distress award to $250,000.

### C. *Mitigation of Damages / Backpay Award*

■ Continental argues that the jury's decision to reduce Blakey's award by $120,000 is "inexplicable and woefully inadequate," and that a new trial on the back pay award is necessary. Defendant's Brief at 22; Reply Brief at 14–15. The Court disagrees. The defendant has the burden of proving that the plaintiff failed to mitigate her damages. *Anastasio v. Schering Corp.,* 838 F.2d 701 (3d Cir.1988). A plaintiff who fails to mitigate damages is not barred from recovering back pay; however, the plaintiff's back pay award may be reduced by the amount she could have earned with reasonable dili-

gence. *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 867 (3d Cir.1995).

Blakey was in a somewhat unusual position during the pendency of the lawsuit. She was not actively working, but she had not been terminated by Continental. Rather she was on administrative leave, by mutual consent. Therefore, she was not entirely free to obtain another job, nor was she able to return to work in what she perceived as an unremedied hostile environment. The jury instructions took account of her unique status and provided that on the issue of mitigation, Continental had to prove *"either* that it was reasonable for [Blakey] to return to work, *or* that there were substantially equivalent positions available to her, which she could have in fact obtained through the use of reasonable diligence; and that she failed to use reasonable diligence in attempting to secure such positions." Jury Instructions at 38 (emphasis added).

Continental failed to introduce any evidence that it was reasonable for Blakey to return to work. Continental argues that the work environment had improved by 1993 and that Blakey should have therefore returned to work. Continental also confuses Blakey's medical condition with Continental's work environment. Because Blakey was fit to fly does not mean that Continental's cockpits were fit to work in. There was sufficient evidence for the jury to conclude that it was reasonable for Blakey not to return to work. Continental forgets that it had the burden of proof on the issue of mitigation damages. Continental simply failed to meet it.

The jury, in effect, found that Continental was liable for not effectively correcting a hostile work environment based on the continued presence of pornography in the flight decks even after it was brought to management's attention. Although Continental eventually eliminated the problem, it did nothing, as far as the record is concerned, to assure Blakey of that. It was content to let her remain on administrative leave. Continental did nothing in the interim to allay her fears. It cannot now avoid the consequences. The jury heard evidence that pornography continued to appear in aircraft after 1993 and that Continental management failed to take

sufficient action to investigate her complaints about other pilots. Given the evidence of Blakey's previous unpleasant experiences with Continental management, the jury was entitled to conclude that it was not reasonable for her to return to work.

That Blakey's skepticism of Continental's efforts were well-founded was dramatically demonstrated at trial when one of her former chief pilots volunteered something to the effect that he did not believe (even today) that the evidence of pornography at Continental constituted sexual harassment. Apparently he was unaware of the EEOC's *Policy Guidance on Sexual Harassment*, 8 FEP Manual at 405:6681 (issued on March 19, *1990* ) that states:

> [P]roliferation of pornography and demeaning comments, if sufficiently continuous and pervasive, "may be found to create an atmosphere in which women are viewed as men's sexual playthings rather than as their equal coworkers." *[Barbetta v. Chemlawn Services Corp.,* 669 F.Supp. 569, 573 (W.D.N.Y.1987)]. The Commission agrees that, depending on the totality of circumstances, such [an] atmosphere may violate Title VII.

*Id.* at 405:6692.

Nor did Continental provide any evidence that Blakey could have reasonably obtained a substantially equivalent position as a pilot. The jury was not required to presume that Blakey would have found a position at the same salary that she was making as an A300 captain. Even if Blakey had been able to find other work as a commercial airline pilot, she would not necessarily have had the same seniority or the same salary. Blakey presented evidence at trial quantifying her lost wages. Continental did not dispute this evidence. The jury apparently used Blakey's uncontested evidence and calculated back pay as four years of Blakey's salary plus benefits as a captain, based on the approximately four years she was not flying. The jury then subtracted $120,000 from Blakey's back pay award based on their calculation of

what she could have reasonably earned during the period she was not flying. The Court finds this to be a rational determination of back pay damages given the evidence presented at trial.[6] Therefore, Continental's motion for a new trial or remittitur as to the back pay award is denied.

## III. *CONCLUSION*

For the foregoing reasons, Continental's motion for a new trial or remittitur on the jury's back pay and front pay award is **denied**. Continental's motion for remittitur of the jury's emotional distress award is **granted** and the emotional distress, pain and suffering award is reduced to $250,000. Continental's motion for a new trial is **conditionally granted** solely on the issue of emotional distress and pain and suffering damages if Blakey does not accept a remittitur of the emotional distress damages award to $250,000. An appropriate order follows.

### *ORDER*

This matter having come before the Court upon the motion of Defendant Continental Airlines, Inc. for a new trial on the issue of damages, or in the alternative, remittitur of the damages award;

The Court having considered the submissions and argument of the parties;

For the reasons set forth in the Court's opinion filed this day; and

For good cause shown;

It is this 30th day of JANUARY, 1998, hereby ORDERED that Continental's motion for a new trial or remittitur as to the jury's back pay and front pay award is **denied**;

It is further ORDERED that Continental's motion for a remittitur as to the jury's emotional distress award is **granted,** and that the award for emotional distress, pain and suffering is reduced to $250,000; and

---

**6.** The jury's front pay award appears to be approximately six weeks of Blakey's salary. The jury heard evidence that it would take approximately six weeks for Blakey to resume flying.

Thus, by all indications, the jury rationally and systematically calculated damages based on the evidence.

It is further ORDERED that Continental's motion for a new trial is **conditionally granted** solely as to emotional distress, pain and suffering damages, if Plaintiff refuses to accept the remittitur of emotional distress damages to $250,000.