De PUY INC., Plaintiffs,

v.

BIOMEDICAL ENGINEERING TRUST, Defendant.

No. CIV.A. 97–CV–3450 (AJL).

United States District Court, D. New Jersey.

April 18, 2001.

---

James H. Keale, McCarter & English, Newark, NJ, Donald E. Knebel, Barnes & Thornburg, Indianapolis, IN, for Plaintiff/Counterclaim Defendant.

David N. Ellenhorn, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, NY, Joel D. Siegal, Hellring Lindeman Goldstein, & Siegal LLP, Newark, NJ, for Defendants/Counterclaim Plaintiffs.

## OPINION

LECHNER, District Judge.

This action was brought by plaintiff/counterclaim defendant DePuy Ortho-

paedics, Inc. ("DePuy") against defendants/ counterclaim plaintiffs Biomedical Engineering Trust, Frederick F. Buechel, M.D. and Michael J. Pappas, Ph.D., PE (as trustees of certain trusts entitled Biomedical Engineering Trust and Biomedical Engineering Trust II) (collectively, "BET"). BET sought damages for an alleged breach by DePuy of its obligation to pay royalties to BET on sales of orthopedic products outside the United States. The instant matter was tried to a jury, and DePuy was awarded $25 million in damages. On 28 September 2000, judgment (the "Judgment") was entered against DePuy in the amount of "twenty-five million dollars ($25,000,000.00), plus preand, or, post-judgment interest, as permitted by the court, to be determined at a latter date." Judgment at 2.

Currently before the court is the motion by DePuy for judgment as a matter of law (the "Motion for Judgment as a Matter of Law"), pursuant to Rule 50(b) of the Federal Rules of Civil Procedure ("Rule 50(b)"), or, in the alternative, for a new trial (the "Motion for a New Trial") or remittitur (the "Motion for Remittitur") (collectively, the "DePuy Post Trial Motions").[1] Also before the court is the motion of BET to amend the Judgment to include prejudgment and, or, post-judgment interest (the "BET Motion to Amend the Judgment"),[2] pursuant to Rule 59(e) of the Federal Rules of Civil Procedure ("Rule 59(e)"). Oral argument was conducted on 25 January 2001, at which

1. In support of the DePuy Post–Trial Motions, DePuy submitted a brief (the "DePuy Moving Brief"), a reply brief and a supplemental memorandum.

 In opposition to the DePuy Post–Trial Motions, BET submitted a brief (the "BET Opposition Brief"), a supplemental memorandum (the "BET Supplemental Memorandum") and an appendix to the BET Supplemental Memorandum (the "BET Appendix").

2. In support of the BET Motion to Amend the Judgment, BET submitted a brief (the "BET Moving Brief"), the Supplemental Affidavit of Richard P. Shanley (the "Shanley Aff.") and a reply brief.

 In opposition to the BET Motion to Amend the Judgment, DePuy submitted a brief (the "DePuy Opposition Brief").

time supplemental briefing was requested. Such supplemental briefs were received on 9 February 2001.

For the reasons set forth below, the DePuy Post Trial Motions are denied and the BET Motion to Amend the Judgment is granted.

*Facts*

### A. *Parties*

DePuy, formally known as DePuy Incorporated, is an Indiana corporation with its principal place of business in Warsaw, Indiana. DePuy manufactures and distributes orthopedic products.

Frederick F. Buechel, M.D. ("Buechel") and Michael J. Pappas, Ph.D., PE ("Pappas") are residents of New Jersey. Buechel and Pappas are the trustees of Biomedical Engineering Trust ("Trust I").[3] Buechel and Pappas are also the trustees of Biomedical Engineering Trust II.

Buechel is an orthopedic surgeon. Buechel is also a Clinical Professor of Orthopedic Surgery and a Chief of Total Reconstructive and Arthritis Surgery Services at the University of Medicine and Dentistry, New Jersey Medical School.

Pappas has a doctorate in mechanical engineering and is a professional engineer. In addition, Pappas is a Professor Emeritus at the New Jersey Institute of Technology and an adjunct professor of surgery at the University of Medicine and Dentistry, New Jersey Medical School.

### B. *Licensing Agreements*

#### 1. *First License Agreement*

On 25 April 1977, DePuy, through its corporate predecessor DePuy, a Division of BioDynamics, Inc. ("BIO"), entered into a license agreement (the "First License Agreement") with BEC.

Under the First License Agreement, BEC, as licensor, owned "all right, title and interest in and on a new and useful orthopaedic device called Floating Center Shoulder Prosthesis [ (the "FCSP") ] covered by U.S. Patent # 3916451, and a certain new and useful orthopaedic device called NJ Knee [ (the "NJ Knee") ], [collectively, the "Devices"]...." First License Agreement at 1.

Pursuant to the terms of the First License Agreement, BEC granted BIO, as licensee, an exclusive license to manufacture, sell and distribute the Devices, and to sub-license others to sell and distribute the Devices. *Id.* at ¶ 1. The term "licensee" under the First License Agreement encompassed BIO and "its parent, affiliate, and/or subsidiary companies whenever the context permits or requires." *Id.* (clause 1).

The First License Agreement also stated BIO "agree[d] to pay to [BEC] a royalty at the rate of ten per cent (10%) of the list price of [the FCSP] and fifteen per cent (15%) of the list price of the said NJ Knee on each of [the Devices] made and sold by [BIO] or by any sub-licensee of [BIO], said list price to be the current list price on the date of the execution of this contract." *Id.* at ¶ 2. Pursuant to the First License Agreement, "the list price of each of [the Devices] shall be fixed by [BIO] and [BIO] shall have full power and authority to change the same from time to time by either raising or lowering the same as it shall see fit." *Id.* at ¶ 5.

In addition, pursuant to the First License Agreement, BIO was required to "render calendar quarterly statements to [BEC] on the 30th day of each calendar month following a calendar quarterly

---

**3.** Biomedical Engineering Corporation ("BEC") is the corporate predecessor in interest to Trust I.

showing the number of [the Devices] made and sold by it during the preceding calendar quarterly." *Id.* at ¶4. The Devices, moreover, were deemed sold under the First License Agreement when payment was received by BIO, either from a purchaser, or from a sub-licensee. *Id.* at ¶6.

### 2. Amendment to the First License Agreement

BEC and BIO subsequently entered into an amendment to the First License Agreement, effective 9 December 1977, (the "Amendment to the First License Agreement"). Amendment to the First License Agreement at 1. The Amendment to the First License Agreement replaced a mistaken reference to "licensor" with "licensee" in paragraph 2 of the First License Agreement. *Id.* The Amendment to the First License Agreement also changed the "current list price" definition for calculating royalties due under the First License Agreement.[4] *Id.* In light of the Amendment to the First License Agreement, royalties due under the First License Agreement were no longer based on the current list price of the Devices as of the date of the First License Agreement. *Id.* Instead, under the Amendment to the First License Agreement, royalty calculations were based on "the list price currently in effect at the time royalties are paid to [BEC] and shall be based on the current list price of either [BIO] or any sub-licensee whichever is higher." *Id.*

### 3. Second License Agreement

On 24 July 1979, BEC and BIO entered into a second license agreement (the "Second License Agreement"). Second License Agreement at 1. The Second License Agreement cancelled the First License Agreement. *Id.* (clause 2). In contrast to the First License Agreement, the Second License Agreement was between "[BEC] ... (hereinafter referred to as Licensor) and [BIO] ... (hereinafter referred to as Licensee)." *Id.* (clause 1).

In addition to the licensing of the FCSP and the NJ Knee, the Second License Agreement encompassed additional devices including the "surface replacement shoulder (the "SRS"), trunion ankle (the "Trunion Ankle") and sliding bearing ankle (the "Sliding Bearing Ankle"), and a set of instruments for implanting the NJ Knee (the "Set of Instruments")" (collectively, the "New Devices"). *Id.* (clause 3).

Under the terms of the Second License Agreement, BIO agreed to pay a royalty to BEC at the rate of ten percent of the list price of the SRS, the Trunion Ankle, the Sliding Bearing Ankle and any modifications of the New Devices. *Id.* at ¶2. BIO further agreed to pay a royalty to BEC at the rate of fifteen percent of the list price of the Set of Instruments and any modifications of such instruments. *Id.* Pursuant to the terms of the Second License Agreement, the fifteen percent royalty due on the list price of the NJ Knee remained unchanged. *Id.*

Notwithstanding the refined designation of the parties to the Second License Agreement and the New Devices, the Second License Agreement incorporated the terms of the First License Agreement, as amended by the 9 December 1977 Amendment. *Id.*

### 4. Amendment to the Second License Agreement

Trust I, successor in interest to BEC,[5] entered into an amendment to the Second

---

4. As discussed, pursuant to the terms of the First License Agreement, "list price" was defined as "the current list price on the date of

the execution of [the First License Agreement]." First License Agreement at ¶2.

5. In or about 1983, BEC transferred, assigned

License Agreement with DePuy, a Division of Boehringer Mannheim Corporation ("BMC"),[6] corporate successor in interest to BIO, effective 25 March 1985, (the "Amendment to the Second License Agreement"). Amendment to the Second License Agreement at 1. The terms of the Amendment to the Second License Agreement define Trust I as the licensor and BMC as the sole licensee. *Id.* (clause 1).

Trust I and BMC entered into the Amendment to the Second License Agreement to clarify and define certain aspects of their relationship. *Id.* (clause 3). The Amendment to the Second License Agreement changed the base figure on which royalties were to be calculated. Pursuant to the terms of the Amendment to the Second License Agreement, all royalties were to be calculated on a sales price ("Sales Price") figure rather than the "list price" figure set forth in the First License Agreement and later modified in the Amendment to the Fist License Agreement. *Id.* at ¶ 2(a). While the base figure on which royalties were to be calculated changed to the Sales Price figure, the percentage paid on royalties for each device did not change from the Second License Agreement. *Id.*

Pursuant to the terms of the Amendment to the Second License Agreement, royalties due on sales of porous-coated components of the NJ Knee (the "Porous Coated Component"), occurring in the United States prior to 1 January 1986, were to be discounted to a rate of fifteen percent of two-thirds of the Sales Price of each Porous–Coated Component. *Id.*

In addition, the Amendment to the Second License Agreement set forth specific definitions for the Sales Price for sales within the United States ("Domestic Sales") and sales outside the United States ("Foreign Sales"). The Amendment to the Second License Agreement defined Sales Price for Domestic Sales as follows:

> For the purposes of [the Amendment to the Second License Agreement], the terms [Sales Price] as to sales in the United States ... shall mean the price paid by an individual hospital, clinic, etc. less credits for returns, for each component of the NJ Knee and for each Instrument; however, where an instrument is sold not to a hospital, clinic, etc. but instead to a distributor or other such person who retains ownership thereof, the [Sales Price] shall be the price paid by such distributor or other such person. LICENSOR [BET] agrees that where compensation is received neither by LICENSEE [DePuy] nor a sub-licensee, nor a distributor nor any other person from the sale or transfer of any component or instrument, no royalties shall be paid to LICENSOR [BET].

*Id.* at ¶ 2(b).

By contrast, the Amendment to the Second License Agreement defined Sales Price for Foreign Sales as follows:

> For the purposes of [the Amendment to the Second License Agreement], the term [Sales Price] as to sales outside the United States ... shall mean the price paid by a nonaffiliated purchaser in an arms-length transaction less credits for returns for each component of the NJ Knee and Instrument. A nonaffiliated purchaser is any person, firm or corporation which does not control

---

and sold all rights, title and interest as licensor under the Second License Agreement to Trust I.

**6.** Subsequent to the Amendment to the Second License Agreement, BMC transferred, assigned and/or sold to DePuy its rights, title and interest in the Second License Agreement, as amended by the 25 March 1985 Amendment.

LICENSEE [DePuy] is not controlled by LICENSEE [DePuy], or is not under common control with LICENSEE [DePuy] by any person, firm or corporation.

*Id.* at ¶ 2(c).

## C. *Royalty Calculations*

For the first eight years after the Amendment to the Second License Agreement became effective, DePuy utilized a "transfer price" to compute royalties. Trial Transcript at 168:1–6, 171:21–172:1; BET Trial Brief at 12–17. A "transfer price" was charged by DePuy when its manufacturing facilities in Warsaw, Indiana and Leeds, England transferred products to foreign based affiliates of DePuy. Trial Transcript at 170:12–171:4; BET Trial Brief at 13. These transfer prices were arbitrary prices set solely for internal tax and bookkeeping purposes within the worldwide DePuy organization. Trial Transcript at 170:12–171:4; BET Trial Brief at 13. Transfer prices had nothing to do with actual market prices and were a fraction of the prices DePuy affiliates actually charged on sales to unaffiliated purchasers. Trial Transcript at 170:12–171:4; BET Trial Brief at 13.

In December 1993, following an investigation by accountants for BET, DePuy conceded it had no right to use transfer prices to calculate royalties, and agreed to compensate BET for underpaid past due royalties. Trial Transcript at 136:9–140:18, 170:8–174:21; BET Trial Brief at 24. DePuy subsequently paid BET $2.8 million in past due royalties. *Id.* The $2.8 million payment was based on a wholesale price list known as the "Independent Distributors List Price" (the "IDLP"). *Id.* DePuy continued to use IDLP to calculate royalties for the remainder of the period at issue. *Id.*[7]

## D. *Procedural History*

On 15 February 1995, DePuy filed a complaint for declaratory judgment, (the "DePuy Complaint"), against BET in the Northern District of Indiana, South Bend Division, captioned *DePuy Inc. v. Biomedical Engineering Trust* Civil Action No. 95–0107. DePuy Complaint. The DePuy Complaint alleged the action was within

---

7. James A. Lent ("Lent"), the former president of DePuy, specifically testified as follows:

Q. Mr. Lent, do you recognize the handwriting on this document?

 * * * * * *

A. Yes.

 * * * * * *

Q. Now, it says at the top, "Jim, I've just been advised by Steve Artusi and Larry Payton that there may be a discrepancy in the way that LCS royalties on international sales have been computed. They believe that Bob Bullock may have been computing sales based on the transfer price rather than the international distributor price." Do you remember that?

A. Yes, I do.

 * * * * * *

Q. I want you to read to the jury the handwriting, if you can, that is where the first arrow is, just to the right of what says "Mike McCaffrey."

A. Okay. It says, "How much do we owe? 2.2."

Q. Is that something you wrote?

A. Yes.

Q. What does it say under that?

A. "Pay them the correct amount plus interest any pay it in 1993."

Q. Whose notes are those?

A. That's mine.

Q. Why were you writing on there?

A. Because it's the right thing to do. Trial Transcript at 135:4–137:18. Lent further testified as follows:

Q. Now, did there come a time—in 1993, when you did learn that for some many years, eight years or so, the foreign royalties had been calculated on the wrong basis. Isn't that true?

A. Whenever that was that I found out, yeah. *Id.* at 171:21–25.

the original jurisdiction of the District Court pursuant to 28 U.S.C. § 1332. *Id.* The DePuy Complaint sought a declaratory judgment setting forth the respective rights of the parties on the method of calculating the payment of royalties on sales to affiliated purchasers outside the United States. *Id.* at 8.

On 7 June 1995, BET filed a complaint for breach of contract against DePuy in the District Court for the District of New Jersey, captioned *Frederick F. Buechel, M.D. and Michael J. Pappas, Ph.D., PE, as trustees of certain trusts entitled Biomedical Engineering Trust and Biomedical Engineering Trust II v. DePuy Inc.,* Civil Action No. 95–2723(JWB). On 29 August 1995, DePuy filed a motion to dismiss or, in the alternative, to transfer the case to the Northern District of Indiana (the "Motion to Dismiss"). By order and opinion, dated 21 September 1995, (the "21 September 1995 Order and Opinion") the Honorable John W. Bissell, U.S.D.J., granted the Motion to Dismiss and the matter was closed. 21 September 1995 Order and Opinion.

By order, dated 20 February 1996, the DePuy Complaint was transferred from the Northern District of Indiana to the United States District Court, for the District of New Jersey, and assigned to Judge Bissell. On 11 July 1997, BET filed a second complaint (the "BET Action") in this District, which was also assigned to Judge Bissell.

By order, dated 6 October 1997, Chief Judge Anne Thompson, reassigned the DePuy Action and the BET Action from Judge Bissell to the undersigned. By order, dated 14 November 1997, ("the 7 November 1997 Order") the cases were consolidated. 14 November 1997 Order.

On 9 November 1998, DePuy and BET filed cross motions for summary judgment (the "First Cross Motions for Summary Judgment"). On 31 December 1998, however, DePuy and BET entered into a partial settlement and release agreement (the "Settlement Agreement"). Pursuant to the Settlement Agreement, DePuy and BET voluntarily dismissed all but one claim and counterclaim in the instant action. Settlement Agreement. The Settlement Agreement did not resolve the issue of royalty payments due on Foreign Sales by DePuy pursuant to the Second License Agreement, as amended by the Amendment to the Second License Agreement *Id.*

In light of the Settlement Agreement, an order, dated 8 February 1999, (the "8 February 1999 Order") was filed which dismissed the First Cross Motions for Summary Judgment without prejudice. 8 February 1999 Order. The 8 February 1999 Order directed the parties to re-file the First Cross Motions for Summary Judgment and address the unaffected claim and counterclaim, as set forth in the Settlement Agreement. *Id.* On 2 August 1999, DePuy and BET each filed a motion for summary judgment (the "DePuy Motion for Summary Judgment" and the "BET Motion for Summary Judgment") (collectively, the "Amended Cross Motions for Summary Judgment").

### 1. *Amended Cross Motions For Summary Judgment*

DePuy contended in its motion for summary judgment that royalties on foreign sales were triggered by sales to DePuy affiliates and that such royalties were correctly based upon a wholesale equivalent price (i.e., the IDLP). DePuy Moving Brief at 4–5. BET, however, contended that royalties on foreign sales were triggered by a later retail sale by a DePuy affiliate to a third party and that such royalties should have been based upon the actual retail price paid by the third party. *Id.* at 5.

On 5 November 1999, the DePuy Motion for Summary Judgment was granted in part and denied in part, and the BET Motion for Summary Judgment was denied. 5 November 1999 Summary Judgment Decision (the "Summary Judgment Decision") at 44. The term "Licensee" under the Second License Agreement was found to apply exclusively to DePuy and not the DePuy corporate family. *Id.* at 43. Pursuant to the Amendment to the Second License Agreement, DePuy sales to foreign affiliates (i.e., Wholesale Sales) were found to automatically trigger a royalty payment (because DePuy was the only Licensee under the Second License Agreement). *Id.* Nevertheless, it was held that a genuine issue of material fact existed as to the proper method for calculating royalties due on DePuy sales to foreign affiliates. *Id.*

### 2. *Trial*

After a five day trial, the jury found that DePuy breached the Amendment to the Second License Agreement by basing royalties on sales to its foreign affiliates on wholesale, rather than retail prices.

### *Discussion*

### A. *DePuy Post–Trial Motions*

### 1. *Motion for Judgment as a Matter of Law*

DePuy contends the jury impermissibly combined unrelated components of each party's evidence to create a contract neither party intended—i.e., a wholesale sale trigger plus actual retail price. DePuy Moving Brief at 16. According to DePuy, no evidence was presented at trial to support such a construction. DePuy further contends the damage estimate proffered by BET's expert, Richard Shanley ("Shanley"), was unsupported by the evidence. *Id.* at 27. As a result, DePuy contends it is entitled to judgment as a matter of law. *Id.* at 16–35.

### a. *Rule 50(b) Framework*

Rule 50(b) provides, in part:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

 (1) if a verdict was returned:

 (A) allow the judgment to stand,

 (B) order a new trial, or

 (C) direct entry of judgment as a matter of law; or

 (2) if no verdict was returned;

 (A) order a new trial, or

 (B) direct entry of judgment as a matter of law.

Fed.R.Civ.P. 50(b).

When presented with a motion for judgment as a matter of law following a jury verdict, a "[D]istrict [C]ourt must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Mosley v. Wilson,* 102 F.3d 85, 89 (3d Cir.1996) (quoting *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993)); *see also Murray v. United of Omaha Life Ins. Co.,* 145 F.3d 143, 148 n. 4 (3d Cir.1998); *Coleman v. Kaye,* 87 F.3d 1491, 1497 (3d Cir.1996); *NTG Telecommunications, Inc. v. International Business Machines, Inc.,* No. 98–5959, 2000 WL 639330, at *1 (E.D.Pa. May 17, 2000).

A jury verdict should be overturned "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Fultz v. Dunn,* 165 F.3d 215, 218 (3d Cir.1998); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 510 (3d Cir.1998) (citing *Stelwagon Mfg. Co. v. Tarmac Roofing,* 63 F.3d 1267, 1270–71 (3d Cir.1995) ("[F]actual findings [of a jury] are reviewed to determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict.")); *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 200 (3d Cir.1996) (The role of the court is to determine " 'whether the evidence and justifiable inferences most favorable to the non-moving party afford any rational basis for the verdict.' ") (quoting *Anastasio v. Schering Corp.,* 838 F.2d 701, 705 (3d Cir.1988)); *Warren v. Reading School Dist.,* 82 F.Supp.2d 395, 397 (E.D.Pa.2000).

The focus is "not on whether there is literally no evidence supporting the [ ]successful party, but whether there is evidence upon which a reasonable jury could properly base its verdict." *Villanueva v. Brown,* 103 F.3d 1128, 1133 (3d Cir.1997).

#### b. *Allegation that Jury Impermissibly Combined Contract Terms*

■ DePuy does not specifically contend that the evidence presented at trial was insufficient for the jury to determine that foreign royalties should have been based on retail price. Instead, DePuy contends that the use by the jury of retail as opposed to wholesale price created a "new contract"—one not intended by either party. DePuy Moving Brief at 16.

As mentioned, it was previously determined at the summary judgment stage that, pursuant to the Amendment to the Second License Agreement, DePuy sales to foreign affiliates triggered a royalty payment.[8] Summary Judgment Decision at 43. DePuy contends that the evidence presented at trial failed to indicate that any of the parties intended to combine a wholesale price trigger with a retail price. DePuy Moving Brief at 16. As such, DePuy contends it is entitled to judgment as a matter of law. *Id.* at 16.

■ The "touchstone of contract interpretation is to determine the parties' intent." *Trustees of First Union Real Estate Equity and Mortgage Investments v. Mandell,* 987 F.2d 1286, 1289 (7th Cir. 1993) (citing *First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 559 N.E.2d 600, 603 (Ind.1990)).[9] Contract provisions must be harmonized so as not to place undue emphasis upon a particular clause or take language out of context. *Mandell,* 987 F.2d at 1290; *see also Rothe v. Revco D.S., Inc.,* 976 F.Supp. 784, 789 (S.D.Ind.1997). Moreover, Indiana law forbids courts from making a new contract the parties did not make for themselves. *In re Forum Group, Inc.,* 82 F.3d 159, 162 (7th Cir.1996).

The evidence presented at trial was sufficient for the jury to determine the parties "intended" that royalties would be based on the retail prices paid to DePuy affiliates by "unaffiliated purchasers."

At trial, DePuy called three executives as witness, Lent, the former President of DePuy, Richard Keeven ("Keeven"), the

---

**8.** Neither party sought reconsideration of the Summary Judgment Decision.

**9.** The parties agreed, and it was held previously that, pursuant to a choice-of-law provision in the License Agreement, Indiana law controlled the rights and obligations of the parties. Summary Judgment Decision at 20–21.

former in-house counsel for DePuy, and Thomas Oberhausen ("Oberhausen"), the Chief Financial Officer of DePuy. None of these witnesses, however, had any knowledge or recollection of the discussions surrounding the execution of the Amendment to the Second License Agreement. Moreover, none of these witnesses was asked to interpret the meaning of the provisions in the Amendment to the Second License Agreement governing the payment of royalties. In fact, the only witnesses who testified about the negotiations and the purpose of the Amendment to the Second License Agreement were Pappas, Buechel and John Gilfillan ("Gilfillan").[10]

Pappas and Gilfillan testified that the Amendment to the Second License Agreement was written to provide that when DePuy sold products to its own foreign affiliates, the royalties would be based on the retail prices paid to those affiliates by "unaffiliated purchasers," e.g., hospitals.[11] Trial Transcript at 233:21–24; 234:5–11; 262:23–263:3; 332:8–334:4; 337:13–338:25; 630:23–631:25; 632:20–633:2; 634:3–10; 639:21–640:21. For example, Pappas testified:

Q. And under—the contract says that the sales price for sales abroad shall mean the price paid by a non-affiliated purchaser in an arms-length transaction, less credits, et cetera. You're familiar with that, aren't you?

A. Yes.

Q. On those transactions in which DePuy was selling to independent distributors, what would that price be?

A. Well, that would be the price that the independent distributor paid to DePuy.

Q. Now, on those transactions in that situation—at that time in Canada where DePuy was selling to an affiliate, which in turn would resell to the hospitals, what would be the price paid by a non-affiliated purchaser in those transactions.

A. Well, it would be the price paid by the hospital to the affiliate.

*Id.* at 640:6–21. Gilfillan similarly testified:

Q. Again, Mr. Gilfillan, based on a sale by DePuy to a non-affiliate, non-affiliate international distributor, an independent, who then resells it to a hospital, what would the royalty base be?

A. It would be the price charged by DePuy International or DePuy Orthopaedics to the non-affiliated international distributor.

Q. And in a case where DePuy used an affiliated company who—these are all foreign sales, affiliated in France, Germany, Switzerland, whatever, so that there would be a sale to their affiliated company and then a sale to the hospital, what, based on your conversations with Mr. Keeven, would be the basis for the royalty?

A. The basis for the royalty would be the sales price from the affiliated

---

**10.** Gilfillan is the former attorney for BET who drafted the Amendment to the Second License Agreement.

**11.** The Amendment to the Second License Agreement expressly defined "sales price" for sales outside the United States as "the price paid by a non-affiliated purchaser in an arms-length transaction less credits for returns for each component of the N.J. Knee and Instruments. A non-affiliated purchaser is any person, firm or corporation which does not control [DePuy], is not controlled by [DePuy], or is not under common control with [DePuy] by any person, firm or corporation." Amendment to the Second License Agreement at ¶ 2(c).

DePuy company to the hospital as paid.

*Id.* at 279:13–280:2.

The testimony of Pappas and Gilfillan was further substantiated by contemporaneous memoranda prepared by Lent and other DePuy Officials during the negotiations of the Amendment to the Second License Agreement. Trial Exhibits 36, 239, 240.

The witnesses presented by DePuy did not contradict the testimony of Pappas and Gilfillan regarding the purpose of the Amendment. Lent testified that he had no recollection of the negotiations. *See e.g.* Trial Transcript at 162:11–20; 164:4–18; 175:2–14; 177:23–178:16; 181:22–182:2. Keeven, moreover, was never questioned about the negotiations, *id.* at 359–373, and Oberhausen was not involved in the negotiations. *Id.* at 481:13–22.

As mentioned, a jury verdict will be overturned "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Fultz,* 165 F.3d at 218. Moreover, as discussed, the "touchstone of contract interpretation is to determine the parties' intent." *Mandell,* 987 F.2d at 1289.

Buechel, Pappas and Gilfillan testified as to how the parties reached agreement on the computation of foreign royalties. The jury appears to have accepted their testimony. In so doing, the jury did not make a "new contract" for the parties; rather, the jury calculated royalties based on the evidence presented at trial. Because the record contains a "minimum quantum of evidence" from which the jury reasonably afforded BET relief, the verdict will not be overturned. *Mosley,* 102 F.3d at 89 (citations omitted).

c. *Allegation that the Damage Estimate Proffered by Shanley was Unsupported by the Evidence*

DePuy argues that the damage estimate articulated by Shanley ("Method 3") lacked evidentiary support because it was based upon a combination of retail price and a wholesale price trigger. DePuy Moving Brief at 27. As discussed, however, the evidence presented at trial was sufficient to uphold the verdict. *See* pp. 21–25 *supra.*

DePuy, nevertheless, argues that, in response to the Summary Judgment Decision, Shanley impermissibly altered the assumptions upon which Method 3 relied. *Id.* at 29. Such an argument, however, appears to lack merit.

In a written report, dated 4 June 1999, (the "Shanley Report") Shanley utilized three alternative methods for calculating damages. Method 3, the only approach relevant here, was premised on the assumption that damages could be determined by taking the royalties DePuy actually paid BET through 31 December 1998, which DePuy had calculated utilizing the IDLP, determine the ratio between IDLP and the average retail selling price, and then use that ratio to compute the royalties BET should have received. Shanley Report at 7–8; 15–16. Because DePuy had already paid BET royalties on inventory (albeit at what appears to have been improper rates), Method 3 necessarily included royalties on such inventory.

Five months after the Shanley Report was submitted, the Summary Judgment Decision was rendered. As discussed, the Summary Judgment Decision established that a royalty obligation was triggered by DePuy sales to foreign affiliates, but left for the jury to determine how the parties intended such royalties to be calculated. Summary Judgment Decision at 43.

The assumptions underlying Method 3 do not appear to have been altered by the Summary Judgment Decision. While the ruling rendered the two additional methods set forth by Shanley for calculating damages inapplicable, it appears Method 3—based on royalties DePuy had paid on its sales to its affiliates—remained consistent with the ruling.

The testimony of Shanley at trial, moreover, was consistent with his written report. At trial, Shanley explained that his damage calculation was based on taking the royalties DePuy paid on shipments to the affiliates and adjusting those payments to reflect retail prices. Trial Transcript at 731:21–732:25.

DePuy appears to have had ample notice that, at trial, BET would rely on the damage calculation reflected in Method 3, as well as the fact that Method 3 included royalties on inventory. According to BET, its counsel notified counsel for DePuy in March or April 2000 that, as a result of the Summary Judgment Decision, only Method 3 would be used for calculating damages. BET Opposition Brief at 19. Thereafter, on 23 August 2000, BET sent to counsel for DePuy Exhibit 702, a revision of charts annexed to the written report of Shanley, which set forth the calculations supporting Method 3. *Id.*

■ The arguments of DePuy, moreover, appear to be veiled attempts at attacking the relevance and reliability of Shanley's testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Pursuant to *Daubert,* a trial judge is obligated to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended *Daubert's* "gatekeeping" obligation to all expert testimony. *Id.* at 149,

119 S.Ct. 1167. According to the Supreme Court, "where such testimony's factual basis, data, principles, methods, or their application are *called sufficiently into question,* ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786) (emphasis added).

In the present matter, DePuy not only failed to sufficiently call into question the "factual basis, data, principles [and/or] methods utilized by Shanley," it specifically waived any right to make a *Daubert* type objection.

On 29 July 1999, DePuy filed a motion *in limine* seeking to exclude the testimony of Shanley regarding Methods 2 and 3 (the "*Daubert* Motion"). *Daubert* Motion at 2, attached as Ex. A to the BET Appendix. In addition, DePuy sought a hearing to determine "whether Shanley's testimony should be excluded under *Daubert* and/or the express terms of the parties' license agreement." *Id.* DePuy argued that *Daubert* imposes "two distinct requirements for admissibility of expert testimony," namely, the expert's methodology must be reliable and "the underlying methodology must be *relevant* or *fit*—*i.e.,* it must actually apply to the facts, and assist the trier of fact in determining a fact in issue." Brief in Support of *Daubert* Motion at 19–20, attached as Ex. B to the BET Appendix (emphasis in original text). DePuy also argued that the "assumptions and methodologies [of Shanley] simply do not fit the true circumstances of this case." *Id.* at 33.

On 22 November 1999, following a conference before then Magistrate Judge Cavanaugh, DePuy submitted a letter (the "22 November 1999 Letter") to Judge Cavanaugh explaining that it was *not* withdrawing its then pending *Daubert* motion

to exclude testimony of Shanley on Methods 2 and 3. 22 November 1999 Letter, attached as Ex. C to the BET Appendix (emphasis added). In addition, DePuy stated that "Mr. Shanley's expert report is irrelevant to the remaining issue in the case...." *Id.*

On or about 18 August 2000, the parties submitted revised final pretrial statements and trial briefs. These submissions set forth the facts each party intended to prove and *all* anticipated legal issues.[12] In its revised Final Pretrial Statement (the "BET Final Pretrial Statement"), BET stated that it intended to present evidence demonstrating the parties intended that royalties on sales by DePuy to its affiliates would be based on the retail prices paid to those affiliates by "nonaffiliated purchasers." BET Final Pretrial Statement at 27–28, attached as Ex. D to the BET Appendix. BET further explained that Shanley would testify that BET was entitled to $26 million in damages, based on a calculation which took the royalty payments DePuy had made to BET and then adjusted them upwards to reflect retail prices, rather than the much lower prices in the IDPL. *Id.* at 19–28, 33–34. In addition, BET explained that the damage calculation of Shanley was $12 million greater than that of DePuy's expert because, in accordance with the Summary Judgment Decision, Shanley had included as damages royalties due on all products shipped by DePuy to its affiliates as of 31 December 1998. *Id.* at 34.

The Final Pretrial Statement of DePuy (the "DePuy Final Pretrial Statement") noted that DePuy had filed a motion *in limine* to exclude any testimony by Shanley regarding Methods 2 and 3 on the ground that "they are not reliable, and the assumptions made by [Shanley] do not 'fit' the real circumstances of the case." DePuy Final Pretrial Statement at 14, attached as Ex. F to the BET Appendix. DePuy stated, however, that it had withdrawn the motion "in favor of having the issue decided at trial, if need be, rather than before trial...." *Id.* at 13, n. 1.

On 5 September 2000, one day before the scheduled commencement of the trial, a pretrial conference (the "5 September 2000 Conference") was held. At the 5 September 2000 Conference,[13] DePuy was given the opportunity to adjourn trial in order to address any perceived legal and factual deficiencies in the expert opinion of Shanley. DePuy, however, declined:

COURT: Now, also I understand from DePuy that there was an issue with regard to *Daubert* and that issue is withdrawn and is dead. Is that correct?

KOCHELL:[14] *It is dead and waived and withdrawn.*

* * * * * *

ELLENHORN:[15] I may have to bring my expert [Shanley], but I don't understand—

COURT: If he's going to bring his expert, do I have a *Daubert* situation?

---

**12.** A scheduling order, dated 6 May 1999 (the "6 May 1999 Scheduling Order") stated that the *"[f]ailure to brief any issue, including an evidentiary issue which should have been anticipated, will be deemed to be a waiver of such issue."* 6 May 1999 Scheduling Order at ¶ K (emphasis in original).

**13.** There was an off-the-record discussion which preceded the 5 September 2000 Con-

ference. 5 September 2000 Conference Transcript at 2:9–22.

**14.** Howard E. Kochell, an attorney with Barnes & Thornburg, represented DePuy at the 5 September 2000 Pre-Trial Conference.

**15.** David N. Ellenhorn, an attorney with Solomon, Zauderer, Ellenhorn, Frischer & Sharp, represented BET at the 5 September 2000 Pre Trial Conference.

KOCHELL: No.

5 September 2000 Conference Transcript at 2:23–3:1; 32:15–20 (emphasis added). The parties were further instructed:

> COURT: My point is I want to be able to look at these issues ahead of time. I don't want to be blind-sided by anything.... If there is anything that I need to look at, I want to know right now. I do not want to be surprised.... I do not want to be caught between a rock and a hard spot. If I make a mistake, fine, have at it, but I don't want to be in a [difficult] position if you were pushing *Daubert,* I don't think it's fair for me to have a *Daubert* hearing in the middle of trial. That's the type of [issue] I'm trying to get at.

*Id.* at 7:17–8:6. Indeed, the parties were given the opportunity to adjourn the trial for two weeks in order to address any problems with the expected testimony of Shanley:

> COURT: If this is something I need to look at and it's going to be crucial to either side, maybe the better part of valor is for you [to] brief this ... and we['ll] pick a jury two weeks from now.

*Id.* at 30:1–4. Counsel for DePuy, nevertheless, elected not to raise any legal or factual deficiencies with regard to the expert opinion of Shanley and, instead, opted to go forward with the trial.[16]

On 12 September 2000, the fourth day of trial, in direct contradiction to the representations DePuy had made at the 5 September 2000 Conference, DePuy submitted a brief in support of a motion to strike the testimony of Shanley (the "Motion to Strike"). In the Motion to Strike, DePuy asserted the same arguments it had made in the withdrawn *Daubert* Motion and the 22 November 1999 Letter. Motion to Strike at 6, attached as Ex. H to the BET Appendix. Specifically, DePuy argued that the testimony of Shanley should be stricken because it was irrelevant and inconsistent with the trial testimony of Buechel, Pappas and Gilfillan. *Id.* DePuy characterized such testimony as taking "the position that royalties are not triggered until the affiliates resell the goods to a non-affiliated purchaser and are paid in connection with that sale." *Id.*

On 13 September 2000, oral argument was conducted on the Motion to Strike. At that time, it was observed that "DePuy's counsel raise[d] issues which seem to be an end run around the waiver, seem[ed] ... to be 'fit' issues as referred to by the Supreme Court in *Daubert* and that there did not seem to be any surprise or undue prejudice to DePuy." Trial Transcript at 774, 786. The Motion to Strike was subsequently denied.

Despite the foregoing, DePuy has reasserted its objections to the testimony of Shanley as part of its Post Trial Motions. DePuy Moving Brief at 27. Although DePuy has avoided mentioning *Daubert* or the term "fit" in the Post–Trial Motions, its challenge to the testimony of Shanley appears to be premised on an asserted lack of relevance of such testimony. *Id.* at 27–35.

The *Daubert* Court held that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only *relevant,* but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786 (emphasis added). In explaining the relevance prong of the analysis, the Court stated:

> Rule 702 further requires that the evidence or testimony "assist the trier of

---

**16.** At trial, neither side was limited in the presentation of evidence or in the cross examination of witnesses. This is especially telling because DePuy did not offer an expert witness and its cross examination of Shanley was less than what might have been expected under the circumstances of the case.

fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *See also United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). The consideration has been aptly described by Judge Becker as one of "fit."

*Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (some internal citations omitted); *see also In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 742–43, 745 (3d Cir.1994); *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 377 (D.N.J.1995) ("[T]he question of fit is whether the testimony can be applied to the facts at issue."). Moreover, the Circuit, in *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir.2000), recently stated:

> Rule 702 and 703 bear on foundation analysis, but neither Rule addresses it in explicit terms; nor do the advisory committee notes accompanying the Rules. Nonetheless, a lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to "assist the trier of fact," as Rule 702 requires. This type of an opinion misleads the fact-finder and arguably does not comply with the "fit" requirement of that Rule.

*Elcock*, 233 F.3d at 756, n. 13.

In substance, DePuy argues that the testimony of Shanley does not "fit" because he measured damages based on an assumption that a sale *to an affiliate* generated a royalty, whereas DePuy contends

Buechel, Pappas and Gilfillan testified that a royalty was not due until the sale *by the affiliate*. DePuy Moving Brief at 32–35 (emphasis added). This objection tracks the "fit" objection made by DePuy in the withdrawn *Daubert* Motion and the 22 November 1999 Letter. Brief in Support of *Daubert* Motion at 19–20, 33, attached as Ex. B to the BET Appendix; 22 November 1999 Letter, attached as Ex. C to the BET Appendix.

Nevertheless, as discussed, DePuy expressly waived its "fit" objection at the 5 September 2000 conference. *See* pp. 31–34 *supra*. Furthermore, it does not appear that a court must, *sua sponte* and without an objection having been raised, conduct a *Daubert* hearing. In *Kumho Tire*, the Supreme Court stated:

> We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule in respect to all such matter, "establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. 2786. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 692, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application *are called sufficiently into question*, ..., the trial court must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."

*Kumho Tire*, 526 U.S. at 149, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786) (emphasis added). Significantly, *Kumho* explains that the opposing party must "sufficiently call into question," among other things, the factual basis or data upon which the opinions are based, in order for the trial court to be required to hold a *Daubert* hearing. *Id.; see also Macsenti v. Becker*, 237 F.3d 1223, 1232 (10th Cir.2001) (stating that District Courts are not required, *sua sponte*, to

make " 'explicit on-the-record rulings regarding the admissibility of expert testimony.' ") (quoting *Hoult v. Hoult*, 57 F.3d 1, 4 (1st Cir.1995)).

Generally stated, it appears that the obligation of a trial court to hold a *Daubert* hearing arises when the issue is sufficiently called into question. More often than not, this will occur only if the opponent brings the matter to the attention of the court.[17] Without a sufficient basis for a *Daubert* hearing, the expense and delay necessitated by a court, *sua sponte*, demanding such a hearing, could be significant. Moreover, when a court inquires of counsel whether a *Daubert* issue exists and is explicitly told that such an issue is "dead and waived and withdrawn," the court and opposing counsel have a right to rely on such a representation.

DePuy was given ample opportunity to set forth any *Daubert* type objections prior to trial. This is not a situation where (a) sanctions were threatened or implied, (b) there would be a loss of a trial date, a significant delay in trial, or a limitation of the time offered to either party at trial or (c) where blame was allocated—in fact, blame or responsibility for this issue was never addressed or implied.

Rather, the discussion at the 5 September 2000 Conference was an attempt to handle a possibly thorny problem without a jury delay and with an opportunity for each side to prepare for a hearing prior to trial. To suggest a trial judge when addressing *Daubert* must articulate every aspect of *Daubert-i.e.*, scientific reliability, fit, relevance, foundation, assumptions, etc.—is simply impractical. When the party with a previously asserted basis for a *Daubert* objection expressly withdraws such an objection, a court is in no position to challenge that decision. Furthermore,

when the opponent of expert testimony assures the court that the *Daubert* issue is "dead and waived and withdrawn," that is the end of the matter. To compel a *Daubert* hearing under such circumstances forces the parties to spend significant time and resources on a non-issue. Because counsel is more familiar with the facts of a particular case (*e.g.*, whether there is a *Daubert* issue) than the trial judge, counsel should not be second guessed without a significant basis.

DePuy, nevertheless, argues that it could not have known before trial what evidence BET would present. DePuy Moving Brief at 34–35. A review of the pre-trial history in this case suggests that such an argument is disingenuous.

The record demonstrates that DePuy knew precisely what evidence BET was going to offer at trial, as well as its theory of damages. Indeed, the BET Final Pretrial Statement disclosed both the substance of the testimony BET expected to adduce at trial and its theory of damages. BET Final Pretrial Statement at 19–28, 33–34, attached as Ex. D to the BET Appendix. The evidence presented a trial, moreover, was consistent with the BET Final Pretrial Statement. *See e.g.* Trial Transcript at 233:21–24; 234:5–11; 262:23–263:3; 279:13–280:2; 332:8–334:4; 337:13–338:25; 630:23–631:25; 632:20–633:2; 634:3–10; 639:21–640:21. It appears, therefore, DePuy knowingly waived any *Daubert* type objections prior to trial.

"The impropriety of asserting a position which the trial court adopts and then complaining about it … should be obvious on its face and litigants hardly need warning not to engage in such conduct." *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 715 (Fed.Cir.1998). A District Court possesses the equitable au-

---

**17.** This is not to suggest a trial judge could not indirectly become aware of sufficient data to trigger the *Daubert /Kumho* duty to determine, pre-trial, whether proposed expert testimony is relevant and reliable.

thority to sanction such malfeasance through the use of judicial estoppel. *Montrose Medical Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779–80 (3d Cir.2001) (citing *Klein v. Stahl GMBH & Co. Maschinefabrik,* 185 F.3d 98, 109 (3d Cir.1999)).

■ Judicial estoppel is an equitable doctrine that "seeks to prevent a litigant from asserting a position inconsistent with one that [he or] she has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir.1996); *see also Montrose,* 243 F.3d 773, 779–80; *Donaldson v. Bernstein,* 104 F.3d 547, 555 (3d Cir.1997). Judicial estoppel is solely concerned with the relationship between the litigants and the court; judicial estoppel is not concerned with the manner in which adversaries treat each other. *Montrose,* 243 F.3d 773, 779–80; *see also Ryan Operations,* 81 F.3d at 360 ("Judicial estoppel 'is intended to protect the courts rather than the litigants.'") (quoting *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 121–22 (3d Cir.1992)). "The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Ryan Operations,* 81 F.3d at 358 (citation omitted).

For example, in *Anjelino v. The New York Times Co.,* 200 F.3d 73 (3d Cir.1999), the District Court denied the plaintiffs' motion for further discovery based upon representations made by counsel for the plaintiffs. In an affidavit, counsel stated that "[p]laintiffs are prepared to go to trial at this time, and do not require further discovery." *Id.* at 100. The District Court found this declaration to be a "tactical decision, made in the particular context [of a motion to dismiss], to forgo the obvious advantages of discovery in order to move the litigation forward." *Id.* Applying the doctrine of judicial estoppel, the District Court denied the plaintiffs' motion for further discovery. *Id.*

On appeal, the Circuit upheld the District Court's decision denying the plaintiffs' motion to conduct further discovery. *Id.* According to the Circuit, the District Court's use of judicial estoppel was necessary to "preserve the integrity of the courts by preventing [the plaintiffs] from playing fast and loose with the [District Court]." *Id.* (citations and internal quotations omitted).

In the present matter, a conscious decision was made by DePuy to waive any and all *Daubert* issues. The attorneys were encouraged to raise any such issues prior to trial and this encouragement was not linked with criticism, the possibility of sanctions or the loss of a trial date. DePuy, nevertheless, knowingly declined such an opportunity and expressly waived any *Daubert* type objections.[18]

---

18. DePuy attempts to argue that the "issue" it waived was limited to the acceptability or reliability, pursuant to generally accepted accounting principles, of the methodology utilized by Shanley. DePuy Supplemental Brief at 2. Nevertheless, not only was counsel for DePuy asked about any pending *Daubert* issues, counsel was also asked about *any* substantive issues that might be problematic during the course of the trial. *See e.g.* 5 September 2000 Conference Transcript at 7:17–22 ( [COURT]: "My point is I want to be able to look at these issues ahead of time. I don't want to be blind-sided by anything.... If there is anything that I need to look at, I want to know right now. I do not want to be surprised."). Counsel for DePuy, nevertheless, failed to raise any substantive issues at the 5 September 2000 Conference.

The parties, moreover, agreed that the issue at trial was what royalty base should have been utilized by DePuy. *Id.* at 6:1–5 (the issue at trial is "[w]hat is the royalty base"). As mentioned, DePuy was on notice that BET

DePuy cannot be permitted to play "fast and loose" with the court by positing inconsistent positions in order to gain a tactical advantage. *See Montrose,* 243 F.3d 773, 779–80 (stating that the purpose of judicial estoppel is to prevent litigants from playing "fast and loose with the court") (quoting *Ryan Operations,* 81 F.3d at 361). Because DePuy waived the present objections prior to trial, it is estopped from now asserting any such objections. *See Anjelino,* 200 F.3d at 100.

Viewing the evidence the light most favorable to BET, there appears to have been sufficient evidence to support the damage estimate proffered by BET. *See Fultz,* 165 F.3d at 218. DePuy, moreover, waived a *Daubert* hearing and the issues relevant to it. The Motion for Judgment as a Matter of law, therefore, is denied.

2. *Motions for a New Trial or Remittitur*

In the alternative to entering judgment on its behalf, DePuy seeks an order granting a new trial or remitting damages. DePuy Moving Brief at 36. DePuy contends a new trial is warranted because the verdict was against the weight of the evidence. *Id.* In the alternative, DePuy contends that, based on the evidence proffered by BET, damages should be remitted by $14 million. *Id.*

a. *Motion for a New Trial*

■ A new trial may be granted pursuant to Rule 59(a) of the Federal Rules of Civil Procedure "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). The ordering of a new trial, however, is a disfavored remedy because "[s]uch an action effects a denigration of the jury system [because] to the extent that new trials are granted the judge takes over ... the prime function of the jury as the trier of fact." *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1076 (3d Cir.1996) (quoting *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir.1992) (citations omitted)); *see also Helena Chemical Co. v. Nelson,* No. 97–5662, 2000 WL 1880331, at *1 (D.N.J. Dec.29, 2000) (citations omitted).

■ "In ruling on a motion for a new trial, the trial court is permitted to consider the credibility of witnesses and to weigh the evidence." *Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 734 (D.N.J. 1998) (citing *Hurley v. Atlantic City Police Dept.,* 933 F.Supp. 396, 403 (D.N.J.1996)). Where a motion for a new trial is based primarily on the weight of the evidence, the discretion of the trial court is limited. *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993); *Pelican Bait, Inc. v. CNA Ins. Co.,* No. 99–468, 2000 WL 1056452, at *5 (E.D.Pa. Aug. 1, 2000); *see also Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 366 (3d Cir.1999). Indeed, "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Greenleaf,* 174 F.3d at 366 (quoting *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991)); *Paolella v. Browning-Ferris, Inc.,* 158 F.3d 183, 194 (3d Cir. 1998) (citations omitted); *see also Warren v. Reading School Dist.,* 82 F.Supp.2d 395, 400 (E.D.Pa.2000) (citations omitted); *Blakey,* 992 F.Supp. at 734 (citations omitted).

planed on demonstrating that the royalties at issue should have been based on retail sales. *See* p. 39 *supra.* All of this was raised at the 5 September 2000 Conference and thereafter waived by DePuy. 5 September 2000 Conference at 5–6, 35.

In considering a motion for new trial, the evidence must be viewed in the light most favorable to the party with the verdict. *Wagner v. Firestone Tire & Rubber Co.*, 890 F.2d 652, 656 (3d Cir. 1989); *Pelican Bait*, 2000 WL 1056452, at *5 (citing *Marino v. Ballestas*, 749 F.2d 162, 167 (3d Cir.1984)). "To uphold the verdict, the [D]istrict [C]ourt need only determine that the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Pelican Bait*, 2000 WL 1056452, at *5 (citing *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980)).

DePuy argues that the verdict is against the weight of the evidence for the same reasons that it argued a judgment as a matter of law is appropriate in this case. DePuy Moving Brief at 36. As mentioned, "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Greenleaf*, 174 F.3d at 366 (citations omitted). As discussed above, it does not appear that the verdict is against the weight of the evidence, let alone that it shocks the conscience or resulted in a miscarriage of justice. *See* pp. 21–25 *supra.* The Motion for a New Trial is denied.

### B. *Motion for Remittitur*

"Remittitur is appropriate if the [c]ourt 'finds that a decision of the jury is clearly unsupported and/or excessive.'" *Helena Chemical Co.*, 2000 WL 1880331, at *2 (quoting *Spence v. Bd. of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986)); *see also Paolella v. Brown-*

*ing–Ferris, Inc.*, 158 F.3d 183, 189 (3d Cir.1998); *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995). A court, however, is obligated "to uphold the jury's award, if there exists a reasonable basis to do so.... [A] court may not ... reduce the award merely because it would have granted a lesser amount of damages." *Blakey*, 992 F.Supp. at 734 (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)).

DePuy contends that by awarding $14 million in damages for products in the inventory of DePuy affiliates on 31 December 1998 (in addition to $11,000,000 in damages for prior sales), the jury provided BET with a "windfall." DePuy Moving Brief at 36–37. DePuy argues that it is "unjust for a party to retain $14 million in supposed 'damages' it was not entitled to even under the only 'contract' supported by its own evidence (i.e., retail trigger and retail price)." [19] *Id.* at 37.

Remittitur, nevertheless, is not appropriate because the decision of the jury appears to be supported by the evidence. It appears the jury found that DePuy breached the contract, first, by basing the royalties on "transfer prices" from 1985 to 1993, and later, by basing royalties on the IDLP. Without objection by DePuy, the jury was instructed that the case involved royalties on all sales made between 1 January 1998 and 31 December 1998, and that the royalty obligation was triggered by a DePuy sale to its affiliates:

It's already been determined that other parts of the parties' amended second license agreement clearly and unambiguously established that the only licensee

---

19. If royalties were triggered on later retail sale by affiliates and computed on actual retail price (as BET had originally argued), BET would not have been entitled to any royalties on approximately $93,000,000 of affiliate in-

ventories. According to DePuy the "$14 million windfall" results from awarding royalties on this unsold inventory on the ground that a royalty triggered by wholesale sale had occurred. DePuy Moving Brief at 37.

under the contract was DePuy Orthopaedics itself and not the DePuy corporate family. When I've talked about DePuy, I've meant DePuy Orthopaedics. This means that DePuy's obligations to pay royalties to BET were triggered when DePuy itself made a sale, including a sale to a foreign affiliate.

Trial Transcript at 958:9–16; *see also id.* at 953:3–4 (explaining that the period at issue in this matter was from 1988 through 1998).[20] It appears, therefore, the jury correctly included in its verdict $14 million in royalties based on unsold inventory in the possession of DePuy affiliates on 31 December 1998. The Motion for Remittitur is denied.

### C. *BET Motion to Amend the Judgment*

As discussed, the jury found that from 1 December 1988 through 31 December 1998, DePuy breached the Amendment to the Second License Agreement by failing to pay BET the full royalties due on sales by DePuy to its foreign affiliates. Specifically, the jury found DePuy underpaid BET by $25 million.

On 28 September 2000, judgment was entered against DePuy in the amount of "twenty-five million dollars ($25,000,000.00), plus pre- and or post-judgment interest, as permitted by the court, to be determined at a latter date." Judgment at 2. BET is presently moving to amend the Judgment to add prejudgment on the amounts calculated by the jury. DePuy opposes the award of prejudgment interest.

As mentioned, Indiana law controls the rights and obligations of the parties in this matter. Summary Judgment Decision at 20–21. As will be discussed below, it appears BET would be entitled to prejudgment interest under either Indiana or New Jersey law.

### 1. *Entitlement to Prejudgment Interest*

### a. *Indiana Law*

Pursuant to Indiana law, "[t]he purpose . . . of prejudgment interest is to fully compensate an injured party for the lost use of money." *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 876 (Ind.Ct.App.1991). If a party meets the common law criteria, prejudgment interest "is generally not considered a matter of discretion." *J.S. Sweet Co., Inc. v. White County Bridge Comm.*, 714 N.E.2d 219, 225 (Ind.Ct.App.1999).

 The "crucial factor" in awarding prejudgment interest under Indiana law is whether damages are reasonably "ascertainable in accordance with fixed rules of evidence and accepted standards of valuation." *Hammes v. Frank*, 579 N.E.2d 1348, 1357 (Ind.Ct.App.1991) (quoting *Courtesy Enterprises, Inc. v. Richards Labs.*, 457 N.E.2d 572, 580 (Ind.Ct.App. 1983)). To be "ascertainable," the damages need not be liquidated. *The Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349, 365 (1982); *Eden United, Inc. v. Short*, 653 N.E.2d 126, 133 (Ind.Ct.App. 1995). It is enough if the damages result from a "simple mathematical computation." *Hammes*, 579 N.E.2d at 1357 (quoting *Thomas J. Henderson, Inc. v. Leibowitz*, 490 N.E.2d 396, 400 (Ind.Ct.App. 1986)).

 It appears BET satisfies the requirements for prejudgment interest under Indiana law. The issues at trial were whether BET was entitled to royalties based on retail rather than wholesale

---

**20.** The jury instructions used were jointly drafted and agreed upon by the parties prior to trial; the parties tried this case based upon these agreed instructions.

prices, and whether BET was entitled to damages on all sales to affiliates through 1998. A determination of these issues required a decision by the jury on liability and the scope of damages.

Once liability was determined, damages were measured by known standards of value, not by jury estimates. At trial, Shanley established the ratio of IDLP to actual retail selling prices for products during the relevant periods. Once the ratio was determined, the ratio was applied to the royalties actually paid by DePuy to BET (measured at IDLP) to arrive at what the royalties would have been if calculated at retail prices instead of the wholesale prices reflected in IDLP. Trial Ex. 702; Trial Transcript at 732–33; 856–60.

DePuy failed to submit any contrary expert testimony, and any alternative calculation argued, directly or indirectly, appears to have been rejected. It appears the damages in this matter were "reasonably ascertainable" and subject to "mathematical computation." *Hammes*, 579 N.E.2d at 1357.[21]

b. *New Jersey Law*

■■■■ BET also appears to meet the New Jersey criteria for prejudgment interest. Pursuant to New Jersey law, prejudgment interest may be awarded on contract claims in the discretion of the court in accordance with equitable principles. *Sulcov v. 2100 Linwood Owners, Inc.*, 303 N.J.Super. 13, 38, 696 A.2d 31 (App.Div. 1997) (citing *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 478, 541 A.2d 1063 (1988)).

■■■ "The equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another." *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 574–75, 730 A.2d 843 (1999) (citing *Sulcov*, 303 N.J.Super. at 39, 696 A.2d 31). Prejudgment interest "is not meant to be punitive, but rather, it is a payment for the use of money." *Sulcov*, 303 N.J.Super. at 39, 696 A.2d 31 (citing Pressler, *Current N.J. Court Rules*, comment 8 on R. 4:42–11).

In the present matter, equities compel an award of prejudgment interest. For eleven years, DePuy failed to remit millions of dollars in royalties. More specifically, DePuy underpaid BET by $25 million, thereby arrogating to itself the use of money that should have been paid to BET as royalties pursuant to the Amendment to the Second License Agreement. An award of prejudgment interest will appro-

---

**21.** DePuy points out that the verdict of $25 million is $1 million less than Shanley's estimate of $26 million. DePuy Opposition Brief at 11. Such a discrepancy (less than four-percent), however, does not disentitle BET to prejudgment interest. *See Indiana Industries, Inc. v. Wedge Products, Inc.*, 430 N.E.2d 419 (Ind.Ct.App.1982).

In *Indiana Industries*, a buyer sought a price adjustment for inventory that had proven to be obsolete. *Id.* at 421. The plaintiff originally sought $73,108.45 in damages. *Id.* at 427. The plaintiff later changed that figure to $53,476.06. *Id.* The jury, however, awarded the plaintiff $48,358.06 in damages. *Id.*

The court, nevertheless found that the difference in damages sought and the sum actu-

ally awarded by the jury did "not render the damages an unascertainable amount or not subject to mathematical computation." *Id.* at 426; *see also Nering v. Stockstill*, 448 N.E.2d 695, 698 (Ind.Ct.App.1983) (awarding prejudgment interest despite a thirty-percent disparity between damages sought and those actually awarded).

Likewise, in the present matter, a four-percent disparity between the damages sought by BET and those actually awarded by the jury do not render the damages "unascertainable" or "not subject to mathematical computation." *Indiana Industries*, 430 N.E.2d at 426; *see also Nering*, 448 N.E.2d at 698.

priately compensate BET for lost earnings on the sums wrongfully retained by De-Puy. *See North Bergen Rex Transport,* 158 N.J. at 574–75, 730 A.2d 843; *Sulcov,* 303 N.J.Super. at 39, 696 A.2d 31.

### 2. *Interest Rate*

██ Indiana and New Jersey, nevertheless, employ different interest rates. According to BET, if the Indiana rate is used, DePuy would be required to pay interest at a rate of eight percent a year—an amount equal to $9,581,974 through 31 October 2000 and $5,479 per day thereafter. Shanley Aff. at Ex. 4. If, however, the New Jersey rate is used, BET contends DePuy would be required to pay interest in the amount $6,155,913 through 31 October 2000 and $3,425 per day thereafter.[22] *Id.* at Ex. 5.[23]

For the reasons set out below, it appears the Indiana interest rate should apply.

██ The ordinary diversity rule is that a District Court follows choice-of-law principles of the State where it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (Delaware Federal court had to follow Delaware choice-of-law rules on prejudgment interest).

Under *Klaxon,* the New Jersey choice-of-law rules must be utilized in deciding what law applies. Such a determination would turn on whether New Jersey views prejudgment interest as "substantive" (meaning it would apply Indiana prejudgment interest law) or "procedural" (mean-ing New Jersey would apply its own prejudgment interest law). *Draper v. Airco, Inc.,* 580 F.2d 91, 97 (3d Cir.1978).

In 1978, this Circuit held that New Jersey would view prejudgment interest as substantive. *Draper,* 580 F.2d at 97. The *Draper* Court found that the "clearest indication of New Jersey's rule on the choice of law with respect to damages is in *Busik v. Levine,* 63 N.J. 351, 357 (1973)." According to *Draper,* in *Busik,* the New Jersey Supreme Court had "determined that, by the majority view, damages generally and prejudgment interest specifically are a matter of substance insofar as conflict of law principles are concerned." *Draper,* 580 F.2d at 98. Hence, *Draper* held New Jersey would apply the prejudgment interest law of the State whose law governed the substantive dispute. *Id.*

Last year, however, the New Jersey Supreme Court ruled otherwise. *See North Bergen Rex Transport,* 158 N.J. at 569, 730 A.2d 843. *North Bergen Rex Transport* involved the issue of whether New Jersey or Illinois prejudgment interest law applied to a dispute governed by Illinois law. *Id.* at 568, 730 A.2d 843. Like *Draper, North Bergen Rex Transport* looked to *Busik. Id.* at 569, 730 A.2d 843. But where *Draper* pointed to *Busik's* noting the majority view of prejudgment interest as substantive, *North Bergen* found another *Busik* passage instructive, stating: "This Court has also observed that it is not 'inappropriate to think of prejudgment interest as a matter of procedure in the context of lawmaking.'" *Id.* (quoting *Bu-*

---

**22.** Pursuant to New Jersey law, the rate at which prejudgment interest is calculated is within the discretion of the court. *Musto v. Vidas,* 333 N.J.Super. 52, 71–75, 754 A.2d 586 (App.Div.2000). The rate applied in New Jersey to postjudgment interest pursuant to New Jersey Court Rules 4:42–11(a)(ii) generally provides an appropriate benchmark. *In re Estate of Lash,* 329 N.J.Super. 249, 263–64,

747 A.2d 327 (App.Div.2000); *Benevenga v. Digregorio,* 325 N.J.Super. 27, 35, 737 A.2d 696 (App.Div.1999). That rate has varied over the eleven year period at issue.

**23.** Although BET computed interest through 31 October 2000, it is entitled to prejudgment interest through 27 September 2000, the day before the Judgment was entered.

*sik,* 63 N.J. at 351, 307 A.2d 571). Hence, *North Bergen Rex Transport* applied New Jersey prejudgment interest law in an Illinois contract dispute. *North Bergen Rex Transport,* 158 N.J. at 569, 730 A.2d 843.

In sum, if the ordinary *Klaxon* rule applies, this Court would follow New Jersey choice-of-law rules. Under those rules—as *North Bergen Rex Transport* demonstrates—New Jersey applies its own prejudgment interest law even when the underlying dispute is governed by the law of another State.

■ Nevertheless, a District Court to which a case is transferred under 28 U.S.C. § 1404(a) ("Section 1404(a)") should apply the choice of law rules that would have been applied by the transferor court. *Ferens v. John Deere Co.,* 494 U.S. 516, 531, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

As discussed, DePuy initially filed a declaratory judgment action against BET in the Northern District of Indiana. BET successfully moved pursuant to Section 1404(a) to have the Indiana case transferred to the District of New Jersey. After the transfer, BET filed the counterclaim on which the $25 million verdict was rendered. The claims on which BET is now entitled to prejudgment interest were counterclaims in an action originally brought by DePuy in the Northern District of Indiana, and then transferred to the District of New Jersey. Therefore, pursuant to *Van Dusen,* this court (the transferee court) must use the choice-of-law rules of Indiana (the transferor court) regarding prejudgment interest. *See e.g.*

*Brown v. Hearst Corp.,* 54 F.3d 21, 24 (1st Cir.1995) (utilizing transferor court's choice-of-law rules even though claim at issue arose after the transfer by way of an amendment to the original complaint).[24]

■ Indiana follows the approach formulated by the Restatement (Second) of Conflict of Laws when deciding which law to apply when there is a conflict. *The Travelers Indemnity Co. v. Summit Corp. of America,* 715 N.E.2d 926, 931 (Ind.Ct. App.1999). For cases like this one, the Restatement refers courts either to a choice of law provision in the contract at issue, or to the place of performance. *Hartford Accident & Indemnity Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind.Ct. App.1997) (citing Restatement (Second) of Conflict of Laws § 188 (1971)).

As discussed, the parties agreed, and it was previously held that, pursuant to a choice-of-law provision in the License Agreement, Indiana law controlled the rights and obligations of the parties. Summary Judgment Decision at 20–21. Because the contract at issue contains a choice-of-law provision mandating the use of Indiana law, it appears an Indiana court would apply the prejudgment interest law of Indiana. *Id.* The Indiana prejudgment interest rate, therefore, is applicable in this matter.

As mentioned, BET contends that, pursuant to Indiana law DePuy owes prejudgment interest in an amount equal to $9,581,974 through 31 October 2000 and $5,479 per day thereafter.[25] Shanley Aff. at Ex. 4. DePuy does not dispute this figure. According to DePuy, "[b]ecause BET cannot show entitlement to prejudg-

**24.** To hold otherwise would result in an inconsistent application of the choice-of-law rules, i.e., Indiana choice-of-law rules would apply to the claims of DePuy and New Jersey choice-of-law rules would apply to the counterclaims of BET, despite the fact that all of

the claims arose from the same contract dispute.

**25.** As discussed, BET is entitled to prejudgment interest through 27 September 2000, the day before the Judgment was entered.

ment interest under either Indiana or New Jersey law, the Court need not focus on the assorted interest calculations in the two Shanley Affidavits." DePuy Opposition Brief at 19 n. 14. DePuy further states it will "address those calculations in the unlikely event they are relevant." *Id.*

At a conference on 6 November 2000 (the "6 November 2000 Conference"), the parties were instructed to submit all of their respective motions in one, all-inclusive brief. DePuy has attempted to circumvent the express direction to brief all issues at once by stating it will address the BET prejudgment interest calculation in the "unlikely event they are relevant." *Id.* Based on the foregoing, such calculations are, in fact, relevant.

DePuy was given the chance to address the interest calculations presented by BET. Instead, DePuy chose to rely solely on its argument that prejudgment interest is not available in this matter. DePuy, therefore, is foreclosed from presenting anything further on this issue. *See e.g. Commerce National Ins. Services, Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 443 (3d Cir.2000) (finding that plaintiff had the opportunity to undertake discovery and prepare for trial but instead "chose . . . to run the risk of relying on the slender record presented with its request for a preliminary injunction.").

BET is entitled to prejudgment interest through 27 September 2000, the day before the Judgment was entered. The Indiana interest rate and the methodology set forth in the uncontradicted Affidavit of Richard Shanley are to be utilized in computing the amount of prejudgment interest. In addition, pursuant to Section 1961 of Title 21, BET is entitled to post-judgment interest commencing on 28 September 2000, the day the Judgment was entered. *See* 28 U.S.C. § 1961.

*Conclusion*

For the reasons set forth above, the DePuy Post Trial Motions are denied and the BET Motion to Amend the Judgement is granted. An order accompanies this opinion.